**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5435-10T2
                  A-1459-11T2
                  A-2138-11T3
                  A-2448-11T2
                  A-3256-11T2

J.B.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.
_____

L.A.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.
_____

B.M.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.
_____

<div style="border:1px solid black; display:inline-block; padding:10px;">

**APPROVED FOR PUBLICATION**

**November 26, 2013**

**APPELLATE DIVISION**

</div>

L.A.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

W.M.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

> Argued October 29, 2013 - Decided November 26, 2013
>
> Before Judges Sabatino, Hayden, and Rothstadt.
>
> On appeal from the New Jersey State Parole Board.
>
> Joseph S. Murphy argued the cause for appellants.
>
> Christopher C. Josephson, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel and on the briefs; Lisa A. Puglisi, Assistant Attorney General, of counsel in A-2448-11T2; Mr. Josephson, on the briefs).

The opinion of the court was delivered by

SABATINO, J.A.D.

Appellants J.B., L.A., B.M., and W.M. are individuals who have been convicted of sexual offenses, have completed their respective prison terms, and are now being monitored by respondent New Jersey State Parole Board (the "Parole Board") as offenders who are subject to either parole supervision for life ("PSL") or its statutory predecessor, community supervision for life ("CSL"). N.J.S.A. 2C:43-6.4. Represented by the same attorney, appellants challenge the constitutionality of certain terms of supervision the Parole Board has imposed upon them. Similar conditions have been imposed on other offenders subject to CSL or PSL, although appellants have not filed a class action.

The terms of supervision mainly being challenged in these related appeals[1] are (1) the Parole Board's restrictions on appellants' access to social media or other comparable web sites on the Internet; and (2) the Parole Board's authority to compel them to submit to periodic polygraph examinations. One of the appellants, L.A., also contests the Parole Board's imposition upon him of a Halloween curfew and an electronic monitoring condition.

---

[1] The five appeals (two of which were filed by L.A.) were calendared back-to-back, and we consolidate them for purposes of this opinion.

For the reasons that follow, we reject appellants' facial challenges to the Internet access restrictions, subject to their right to bring future "as-applied" challenges should they avail themselves of the Parole Board's procedures for requesting specific permission for more expanded Internet access and are then denied such permission.

We do not decide at this time the merits of appellants' constitutional attack upon the polygraph requirements. Instead, we refer that subject matter to the trial court for supplemental proceedings, pursuant to Rule 2:5-5(b), for the development of an appropriate record, including scientific or other expert proofs, and for fact-finding. Such proofs and fact-finding shall focus upon the alleged therapeutic, rehabilitative, and risk management benefits of polygraph testing when it is conducted within the specific context of post-release oversight of sex offenders.

Lastly, we uphold the Parole Board's actions concerning the Halloween curfew, and dismiss as moot the claims concerning L.A.'s electronic monitoring, which has ended.

I.

The circumstances of each appellant are substantially the same. Each has been convicted of a sexual offense, has served his sentence, and is now under supervision by the Parole Board.

Each objected to certain restrictions the Parole Board imposed upon him, arguing that those restrictions violated his constitutional rights. And, in each instance, the Parole Board has denied the offender's constitutional claims in a written final agency decision without conducting a plenary evidentiary hearing.

B.M.

B.M. pled guilty in March 1988 to one count of second-degree sexual assault upon his daughter, N.J.S.A. 2C:14-2b. He was sentenced to a four-year prison term and ordered to comply with post-release registration and notification requirements pursuant to Megan's Law, N.J.S.A. 2C:7-1 to -6 and N.J.S.A. 2C:7-6 to -11. His sentence was amended to include a CSL term effective upon his release, pursuant to the Violent Predator Incapacitation Act of 1994, N.J.S.A. 2C:43-6.4.

B.M. was released from prison in March 2001. At that time, he received a notice from the Parole Board enumerating the specific conditions being imposed upon him as a CSL parolee. B.M. signed an acknowledgement of those conditions. At some point following his release, B.M. obtained employment as an environmental consultant. His work has frequently involved travel outside of New Jersey.

In July 2009, the Parole Board asked B.M. to submit to a polygraph examination. The request was based on the Parole Board's asserted need to monitor B.M.'s compliance with the conditions of his CSL supervision while on his out-of-state trips. B.M. objected to the polygraph testing, claiming that it violated his constitutional rights. The Parole Board advised B.M. that he would no longer be allowed to travel out-of-state if he refused to take the polygraph, despite the fact that the Parole Board had previously approved his out-of-state travel since 2003. The Parole Board also advised B.M. that he would not be allowed to use a computer to access social networking sites without the approval of a parole supervisor.

B.M. filed an administrative appeal of the polygraph and Internet restrictions, which the Parole Board denied in November 2009. He then appealed that ruling to this court. While that initial appeal was pending, B.M. applied for an emergent stay of the restrictions. After the Supreme Court issued an order directing this court to consider the merits of that emergent application, we granted a stay of the Parole Board's restrictions on B.M.'s interstate travel, pending the appeal.

On June 30, 2010, we issued an unpublished opinion in B.M.'s first appeal, directing the Parole Board to administratively adopt regulations that more fully addressed,

after public notice and comment, the standards, conditions, and procedures governing the Parole Board's use of polygraph testing and Internet access restrictions. B.M. v. N.J. State Parole Bd., No. A-2599-09 (App. Div. June 30, 2010); see also Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313 (1984) (requiring administrative rulemaking for the promulgation of an agency's general standards and procedures). As part of that decision, we directed the Parole Board to continue to allow B.M. to travel out-of-state for business purposes unless "independent grounds" to restrict such travel arose. B.M. v. N.J. State Parole Bd., supra, slip op. at 7. Our opinion did not reach the merits of B.M.'s constitutional challenges, in anticipation that the forthcoming regulations might bear on these constitutional arguments. Id. at 6-8.

Subsequently, as discussed in Parts II and III of this opinion, infra, the Parole Board adopted regulations detailing the Internet usage restrictions for PSL and CSL offenders, as well as supplemental regulations about the polygraph testing of such individuals. B.M. then filed his present second appeal (A-2138-11) reiterating his constitutional objections to both the polygraph testing and Internet restrictions.

J.B.

In April 2002, J.B. pled guilty to one count of endangering the welfare of a child, N.J.S.A. 2C:24-4a, his stepson. He was sentenced to a three-year custodial term and ordered to comply with Megan's Law, N.J.S.A. 2C:7-1 to -23. J.B. was also ordered to comply with CSL monitoring upon his release, N.J.S.A. 2C:43-6.4.

J.B. was released after completing his sentence,[2] and in February 2008, the Parole Board notified him of the polygraph condition.

Thereafter, in September 2010, the Parole Board required J.B. to submit to a polygraph examination to monitor his compliance with CSL conditions. Like B.M., J.B. objected to the polygraph testing, contending that it violated his constitutional protections. He filed an administrative appeal, which the Parole Board rejected in a May 25, 2011 final agency decision. J.B. then filed this present appeal (A-5435-10).

W.M.

W.M. pled guilty in April 1996 to five counts of second-degree aggravated sexual assault, N.J.S.A. 2C:14-2b, for molesting five young female music students in their homes. He was sentenced to concurrent five-year terms at the Adult

---

[2] The record does not indicate J.B.'s release date.

Diagnostic Center at Avenel, and was required to comply with certain provisions in Megan's Law. W.M. was released from custody in August 1999. His judgment of conviction was amended in 2000 to include a CSL provision.

In January 2008, the Parole Board notified W.M. that he was prohibited from accessing social networking websites as a condition of his supervision. Additionally, in October 2008, W.M. was advised that he was subject to polygraph testing. In September 2011, W.M. was referred for a polygraph examination, which he declined to take.

Invoking similar constitutional claims as the other appellants, W.M. pursued an administrative appeal contesting the polygraph and Internet access restrictions. On January 25, 2012, the Parole Board denied W.M.'s request for relief. He then filed his present appeal (A-3256-11). In June 2012, the Supreme Court granted W.M. a stay of the polygraph examination and Internet restriction pending appeal.

L.A.

In May 2007, L.A. pled guilty to second-degree attempted sexual assault of a minor, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2c(4), after having sexually explicit online conversations with an undercover police officer posing as a boy and then later

attempting to meet with the putative youth at a mall. At the time of this offense in 2005, L.A. was in his sixties.

L.A. was sentenced to a three-year prison term. He was also made to comply with PSL conditions, N.J.A.C. 10A:71-6.12,[3] as well as other Megan's Law requirements. L.A. thereafter completed his prison sentence and was released.[4]

In September 2011, L.A. was told by his parole officer that he had to take a polygraph examination. L.A. objected to the testing on the grounds of improper notice and constitutional defects. He filed an administrative challenge to the testing, which the Parole Board rejected in an October 26, 2011 final agency decision. L.A. then appealed that determination to this court (A-1459-11).

In his second appeal that is also before us (A-2448-11), L.A. challenges the Parole Board's imposition of both a Halloween curfew and an electronic monitoring condition. The Halloween curfew, which the Parole Board imposed on L.A. in

---

[3] The CSL statute was amended in 2003, effective January 14, 2004, to change "community supervision for life" (i.e., CSL) to "parole supervision for life" (i.e., PSL). G.H. v. Twp. of Galloway, 401 N.J. Super. 392, 401 n.4 (App. Div. 2008), aff'd, 199 N.J. 135 (2009); see also L. 2003, c. 267, § 1. The revisions did not change the substance of the law. Cannel, New Jersey Criminal Code Annotated, comment on N.J.S.A. 2C:43-6.4 (2013).

[4] The record does not indicate L.A.'s release date.

October 2011, required that he remain in his home from 2:00 p.m. to midnight on that holiday. L.A. requested permission from the Parole Board to attend two business meetings on Halloween, but his parole officer only granted him permission to attend the day meeting and not the evening meeting. Nevertheless, in violation of the curfew, L.A. went to a shopping mall where he was observed by his parole officer and then sent home.

As a sanction for L.A.'s non-compliance with the Halloween curfew, the Parole Board required him to participate in electronic monitoring. The electronic monitoring included a curfew of twenty hours per day for up to 180 days.

L.A. contested both the Halloween curfew and the electronic monitoring conditions before the Parole Board. In a November 30, 2011 final agency decision, the Parole Board upheld both conditions. L.A. has since completed the electronic monitoring. Nevertheless, he continues to press on appeal his challenges to the Halloween curfew and the electronic monitoring requirement.

## II.

We first consider B.M.'s and W.M.'s arguments that the Parole Board had violated, and continues to violate, their constitutional rights by denying them access to social media websites on the Internet. In particular, appellants contend that these Internet restrictions infringe their rights of free

speech and association under the First Amendment of the United States Constitution, their rights under the Due Process Clause, and their corresponding rights under the New Jersey Constitution. Appellants further claim that the Internet restrictions were imposed without statutory authorization and compliance with the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-4. For the reasons that follow, we reject these facial challenges.

A.

Appellants' constitutional claims must be examined in the context of their distinctive status as sex offenders who have been released into the community after serving their custodial sentences, and who are now under the Parole Board's continued supervision through CSL or PSL.

"Community supervision for life was 'designed to protect the public from recidivism by defendants convicted of serious sexual offenses.'" Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 237-38 (2008) (quoting Sanchez v. N.J. State Parole Bd., 368 N.J. Super. 181, 184 (App. Div.), certif. granted, 182 N.J. 140 (2004), appeal dismissed, 187 N.J. 487 (2006)). As the Supreme Court has recognized, unfortunately, "the relative recidivism rate of sex offenders is high compared to other offenders; treatment success of sex offenders exhibiting

repetitive and compulsive characteristics is low; and the time span between the initial offense and re-offense can be long." Doe v. Poritz, 142 N.J. 1, 15 n.1 (1995).

Given these special characteristics of sex offenders, the Legislature established CSL in 1994 as part of the Violent Predator Incapacitation Act, N.J.S.A. 2C:43-6.4. The statute is one component of a series of laws that are collectively referred to as Megan's Law, N.J.S.A. 2C:7-1 to -23. See also L. 1994, c. 130. Persons who have been convicted between 1994 and 2004 of certain sexual offenses enumerated within N.J.S.A. 2C:43-6.4(a) must serve, in addition to any existing sentence, "a special sentence" of "community supervision for life," and those convicted after that time are sentenced to "parole supervision for life." N.J.S.A. 2C:43-6.4(a); see also L. 2003, c. 267, § 1. This CSL or PSL term follows immediately after the parolee's release from incarceration, if applicable, and includes specified conditions by which he or she must abide. N.J.S.A. 2C:43-6.4(b). The stated purpose of these conditions is "to protect the public and foster rehabilitation." Ibid. Such offenders are supervised by the Division of Parole of the State Parole Board "as if on parole" and may be subject to "conditions appropriate to protect the public and foster rehabilitation." N.J.S.A. 2C:43-6.4(b); N.J.A.C. 10A:71-6.11.

As the United States Supreme Court has recognized, convicted persons — whether they have been found guilty of sexual offenses or other crimes — are generally subject to a constitutionally-permissible degree of continued governmental oversight and diminished personal autonomy when they are on parole or some other form of post-release supervision. "Rather than being an ad hoc exercise of clemency, parole is an established variation on imprisonment of convicted criminals." Morrissey v. Brewer, 408 U.S. 471, 477, 92 S. Ct. 2593, 2598, 33 L. Ed. 2d 484, 492 (1972). "Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able without being confined for the full term of the sentence imposed." Ibid. To accomplish this objective, parolees are typically subjected to "conditions [that] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." Id. at 478, 92 S. Ct. at 2598, 33 L. Ed. 2d at 492.

For instance, parolees must commonly "seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness." Ibid. Parolees must also regularly report to their assigned parole

officer. Id. at 478, 92 S. Ct. at 2598-99, 33 L. Ed. 2d at 492. Subject to procedural fairness and other recognized limitations, the State has a strong interest in assuring that parolees adhere to the conditions of their parole. Id. at 480-84, 92 S. Ct. at 2600-02, 33 L. Ed. 2d at 493-97. Where it is advised, the revocation of parole "deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty [that is] properly dependent on observance of special parole restrictions." Id. at 480, 92 S. Ct. at 2600, 33 L. Ed. 2d at 494.

The New Jersey Supreme Court in Jamgochian, supra, 196 N.J. at 222, extended these general principles of limited liberties in the parole context to sexual offenders sentenced to post-release CSL terms. In that case, the Court declared that a convicted sex offender under CSL could be made subject to restrictions on his liberty, such as an evening curfew, provided that the Parole Board afforded him with constitutional due process protections of notice and an opportunity to object to the curfew restriction. Ibid. Such a person's special status as a CSL offender did not entitle him to the "full panoply of rights" available to a citizen in a criminal trial. Id. at 242.

That said, the Court explained in Jamgochian that such an individual was nonetheless constitutionally protected from

"arbitrary government action." Id. at 241-42. The Court cautioned that, in this context, due process and procedural fairness must be applied flexibly, for the Constitution does not "mandate a regime that will make it impractical to impose a necessary curfew provision to protect the public or rehabilitate the offender." Id. at 246. Moreover, "[d]iscretion must be invested in the Parole Board, which has the agency expertise and authority to implement a scheme that can address the unique circumstances of each case." Id. at 250. Even so, on the record before it, the Court in Jamgochian concluded that the Parole Board had deprived the appellant of a fair opportunity to contest both (1) the Parole Board's claim that he engaged in inappropriate conduct that signaled a prelude to recidivism, and (2) the Parole Board's rationale underlying its decision to impose a curfew. The Court prospectively directed that such procedural safeguards must be afforded in future cases to sex offenders on CSL. Id. at 250-51.

We also must be mindful of the importance of an individual's freedom of speech and association under the First Amendment of the United States Constitution and Article I, Paragraphs 6 and 18 of the New Jersey Constitution. See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (delineating First Amendment

principles); State v. Schmid, 84 N.J. 535 (1980) (delineating cognate principles under the State Constitution). We are particularly mindful that our State Constitution's free speech provisions have, at times, been interpreted more broadly than their federal counterparts. See, e.g., N.J. Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326 (1994); Schmid, supra, 84 N.J. at 535. "[T]he State Constitution furnishes to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights." Schmid, supra, 84 N.J. at 560. As such, the State Constitution "serves to thwart inhibitory actions which unreasonably frustrate, infringe, or obstruct the expressional and associational rights of individuals." Ibid.

B.

Against this backdrop of competing State and individual interests, we examine the Internet restrictions that appellants B.M. and W.M. have challenged in this case.

In 2007, the Legislature amended N.J.S.A. 2C:43-6.4 to add a provision limiting Internet access for sexual offenders serving a CSL sentence, effective February 25, 2008. N.J.S.A. 2C:43-6.4(f); see also L. 2007, c. 219. The statute specified that these conditions could include prohibiting the use of a computer without prior written approval, requiring the offender

to submit to periodic unannounced examinations of his or her computer, requiring the offender to install a monitoring device on his or her computer, and requiring the offender to "disclose all passwords used by the person to access any data, information, image, program, signal or file."  N.J.S.A. 2C:43-6.4(f)(1) to (5).

In our 2010 unpublished opinion in B.M., supra, we noted that, in addition to the absence of adequate regulations governing the Parole Board's administration of polygraph examinations, the agency also had not adopted regulations specifically addressing Internet access restrictions.  B.M. v. N.J. State Parole Bd., supra, slip op. at 4-6.  Among other things, we observed that there did not appear to be any general internal policies or procedures governing those restrictions, or defining key terms such as "social networking" site.  Ibid.

Consequently, on September 29, 2010, the Parole Board adopted new regulations detailing restrictions it could impose on an offender's Internet usage.  N.J.A.C. 10A:71-6.11(b)(22); 42 N.J.R. 2960(a).  It did not receive any public comments when these new rules were proposed.  42 N.J.R. 2960(a).  The new conditions clearly specified that an offender may be subject to Internet restrictions "to access any social networking service or chat room in the offender's home or with any other name for

any reason unless expressly authorized by the district parole supervisor." N.J.A.C. 10A:71-6.11(b)(22).

On January 3, 2012, the Parole Board issued proposals for further amendments to these conditions, "provid[ing] for a definition of social networking service, Internet website or application, chat room and peer-to-peer network." 44 N.J.R. 30(a). In response to that proposal, the Chief Executive Officer of the New Jersey Association of Mental Health and Addiction Agencies, Debra L. Wentz, Ph.D., submitted a comment raising a concern that the proposed restrictions may undesirably impede an offender's rehabilitation efforts. Her comment pointed out that "social media has expanded beyond simply 'socializing' and is becoming an important tool for people in early recovery to network, access emotional support, and gain access to needed services." 44 N.J.R. 1530(a). The Parole Board replied that if a treatment provider believed that accessing social media was conducive to the offender's recovery, "there already exists a mechanism for the matter to be reviewed." Ibid. N.J.A.C. 10A:71-6.6(b), it elaborated, permitted an offender to apply to the Parole Board for a modification of a condition of supervision. Ibid. Consequently, on March 28, 2012, the Board adopted the

additional proposals on Internet restrictions without modification.

B.M. and W.M. now challenge these Internet restrictions. They maintain that the restrictions are overbroad and unduly deprive them access to information, news, business opportunities, and other benign avenues of expression on the Internet. They contend that the Internet has become an increasingly pervasive and vital part of modern life, and that this inability to participate in such everyday communications represents an unconstitutional infringement upon their liberties. Appellants further contend that the Parole Board's regulations do not afford them adequate notice and procedural protections, lest they visit an unauthorized Internet site in error and potentially risk further sanctions and losses of liberty. Lastly, they contend that the Internet regulations do not comport with the procedural standards of the APA.

The Parole Board, in turn, asserts that the Internet restrictions are reasonable measures to assure that sexual offenders serving CSL sentences do not engage in inappropriate interactions with youths or other potential victims, and that, accordingly, public safety justifies such restrictions. It further points out that the regulations contain an explicit process in N.J.A.C. 10A:1-6.11 for an offender serving a PSL or

20

CSL sentence to seek permission from a parole official to gain access to a particular site for work or other reasonable purpose. The Parole Board contends that offenders must exhaust such administrative remedies before requesting this court to strike down the restriction on its face.

## C.

The manifest objective of the Internet restrictions in the authorizing statute and the Parole Board's regulations is not to eliminate the ability of released offenders on PSL or CSL to access the Internet in its entirety. Instead, the provisions are legitimately aimed at restricting such offenders from participating in unwholesome interactive discussions on the Internet with children or strangers who might fall prey to their potential recidivist behavior.

We recognize that websites such as Facebook and LinkedIn have developed a variety of uses apart from interactive communications with third parties. Even so, the Parole Board has reasonably attempted to draw the line of permitted access in a fair manner that balances the important public safety interests at stake with the offenders' interests in free expression and association. As the Deputy Attorney General acknowledged at oral argument, it is not the Parole Board's intention that these provisions bar appellants from having

Internet access to news, entertainment, and commercial transactions.

Significantly, courts in other jurisdictions have upheld comparable Internet usage restrictions for released sex offenders, often subject to the directives of their parole officers. For example, the United States Court of Appeals for the District of Columbia Circuit upheld a tailored Internet usage restriction for the probationer there, a convicted sex offender with a history of soliciting sex from minors and trading child pornography. United States v. Love, 593 F.3d 1, 11-13 (D.C. Cir. 2010). Like appellants here, the probationer in Love argued that the Internet usage restriction was excessive, "in light of the near ubiquity of the Internet in everyday life." Id. at 11. The court rejected that claim, deferring to the probation board's determination that the restriction was appropriate in light of the nature of the appellant's crimes. Id. at 11-12. Although recognizing that the Internet restriction would "no doubt" substantially affect the appellant's day-to-day activities, the court noted, however, that it would also appropriately prevent him from using the Internet to trade child pornography. Ibid. All of these factors must be considered together, the court explained, and in

doing so, it held that the probation board's decision was reasonable.  Id. at 12-13.

In a similar vein in United States v. Crandon, 173 F.3d 122 (3d Cir. 1999), the Third Circuit Court of Appeals upheld as constitutional an Internet usage restriction as a condition of the defendant's supervised release.  There, the defendant had used the Internet as a means to develop a sexual relationship with a young girl over a period of several months.  Id. at 127. The defendant objected to the condition, arguing that it unnecessarily infringed upon his liberty interests and bore no logical relation to his offense.  Ibid.  The Court of Appeals rejected this argument, noting the reasonableness of the restriction in light of the defendant's sexual history.  Ibid. Finding no violation of the defendant's constitutional rights, the court affirmed the Internet usage restriction.  Ibid.[5]

------

[5] The federal appellate case law on this subject is extensive, and most of the circuit courts of appeal have upheld comparable Internet restrictions.  See, e.g., United States v. Ellis, 720 F.3d 220, 225 (5th Cir. 2013) (upholding a condition requiring the defendant to receive prior approval from the court before "possess[ing], hav[ing] access to, or utiliz[ing] a computer or internet connection device"); United States v. Atias, 518 F. App'x 843, 846-47 (11th Cir. 2013) (upholding computer and Internet restrictions as a condition of supervised release where the defendant could still "petition the court for approval to use either a computer or the internet, and the restrictions were related to the 'horrific' and 'unthinkable' nature and circumstances of the offense, as well as the need for deterrence and public protection"); United States v. Deatherage, 682 F.3d
(continued)

(continued)

755, 764 (8th Cir. 2012) (finding that where the defendant received and possessed child pornography, a restriction on his ownership and use of computers or other similar devices was not unreasonable because the ban would be limited "to installing approved computer monitoring devices and consenting to unannounced examination of his computers and storage devices"); United States v. Accardi, 669 F.3d 340, 348 (D.C. Cir. 2012) (upholding a qualified ban on the defendant's ability to access the Internet after conviction for sex crimes); United States v. Balon, 384 F.3d 38, 43-46 (2d Cir. 2004) (upholding a condition of supervised release that required a defendant convicted of transporting child pornography through the use of a computer to provide the U.S. Probation Office with notification of any computers he would use during his supervision term); United States v. Granger, 117 F. App'x 247, 248-49 (4th Cir. 2004) (upholding a special condition of release for the defendant who had used his computer to transport and ship images of child pornography that prohibited him from possessing or using a computer that could connect to a network); United States v. Reardon, 349 F.3d 608, 620-22 (9th Cir. 2003) (upholding a restriction that required a convicted sex offender to receive prior approval from a probation officer before possessing or using a computer with access to any online service); United States v. Suggs, 50 F. App'x 208, 210-11 (6th Cir. 2002) (upholding a condition of supervised release in a fraud case that prohibited the defendant from having access to a personal computer); United States v. Walser, 275 F.3d 981, 987-88 (10th Cir. 2001) (upholding a restriction on Internet access because the defendant "is not completely banned from using the Internet," but rather "must obtain prior permission from the probation officer"). But see United States v. Goodwin, 717 F.3d 511, 523 (7th Cir. 2013) (vacating a special condition of release that required the defendant to install Internet monitoring software on his computers, submit to searches of his person, computer, and other property, and allow his computer to be removed for examinations because the court "fail[ed] to see how these broad restrictions are reasonably related to [the defendant's] offense, history, and personal characteristics"); United States v. Perazza-Mercado, 553 F.3d 65, 69-75 (1st Cir. 2009) (remanding the issue of a total ban on home Internet use as a condition of supervised release to the district court and suggesting that a more appropriate restriction be devised that "reconciles our concern that a convicted sex offender could use

(continued)

24                                                    A-1459-11T2

Guided in part by the weight of authority from other jurisdictions, we are satisfied that the Internet restrictions adopted here by the Parole Board have been constitutionally tailored to attempt to strike a fair balance. Hence, we reject appellants' arguments to strike them down on their face. We instead uphold the regulations as valid under both the First Amendment and the New Jersey Constitution, subject to the right of appellants or other offenders who are subject to a CSL or PSL condition to pursue permission from a parole official to gain access to a specified website for a benign purpose.

We do not presume in the abstract that the Parole Board and individual parole officers will respond to such requests rigidly or unfairly, or that it will ignore an offender's individual circumstances. Instead, this procedural avenue should be exhausted first, subject to the right of an offender to bring a future as-applied constitutional challenge if necessary.

"Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last

---

(continued)
the internet to continue a pattern of inappropriate behavior towards minors with the potential of legitimate uses of the internet that might be crucial to that individual's rehabilitation").

resort.'" <u>Binkowski v. State</u>, 322 <u>N.J. Super.</u> 359, 375-76 (App. Div. 1999) (quoting <u>Broadrick v. Oklahoma</u>, 413 <u>U.S.</u> 601, 613, 93 <u>S. Ct.</u> 2908, 2916-17, 37 <u>L. Ed.</u> 2d 830, 841-42 (1973)). In keeping with such a cautious approach, "[e]ven in a First Amendment case, federal courts are admonished not 'to anticipate a question of constitutional law in advance of the necessity of deciding it, . . . [or] to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" <u>Id.</u> at 373 (quoting <u>Brockett v. Spokane Arcades, Inc.</u>, 472 <u>U.S.</u> 491, 501, 105 <u>S. Ct.</u> 2794, 2801, 86 <u>L. Ed.</u> 2d 394, 404 (1985)); <u>see also</u> <u>Washington State Grange v. Washington State Republican Party</u>, 552 <u>U.S.</u> 442, 450, 128 <u>S. Ct.</u> 1184, 1191, 170 <u>L. Ed.</u> 2d 151, 161 (2008) ("Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" (quoting <u>Sabri v. United States</u>, 541 <u>U.S.</u> 600, 609, 124 <u>S. Ct.</u> 1941, 1948, 158 <u>L. Ed.</u> 2d 891, 900 (2004))).

Thus, courts at times will sensibly decline to strike down a law or regulation on its face, and instead reserve claims of unconstitutionality for future as-applied litigation. <u>See, e.g.</u>, <u>Doe v. Reed</u>, ___ <u>U.S.</u> ___, 130 <u>S. Ct.</u> 2811, 177 <u>L. Ed.</u> 2d

26                                                                  A-1459-11T2

493 (2010) (holding that disclosure of the identity of persons signing petitions in support of ballot referenda does not facially violate the First Amendment, but leaving open the possibility of an as-applied challenge if it could be shown that such disclosure would expose those who had signed petitions to harm); <u>Washington State Grange</u>, <u>supra</u>, 552 <u>U.S.</u> at 457-58, 128 <u>S. Ct.</u> at 1195, 170 <u>L. Ed</u>. 2d at 165 (declining to declare a new election process facially invalid because the challengers' arguments were based on "factual assumptions about voter confusion," and noting that such a "factual determination must await an as-applied challenge").    A similar approach is warranted here.

We also reject appellants' claims that the Internet access restrictions are procedurally flawed or do not comport with APA standards.    As we directed in <u>B.M.</u>, <u>supra</u>, the regulations were adopted through public notice and comment.    In fact, none of the present appellants or their common attorney presented any objecting comments to the proposed Internet regulations before their promulgation, although we recognize that they were not obligated to do so.[6]    On an individual level, it is also

---

[6] As a note of caution, however, we urge the Parole Board to be amenable to fine-tuning the Internet regulations as technology advances and the nomenclature and uses of cyberspace continue to evolve.

procedurally significant that appellants received advance notice that they would be subject to the Internet restrictions.

In addition, we find no violation of due process principles, as the Internet restrictions are reasonably crafted on their face to promote important State interests. See Jamgochian, supra, 196 N.J. at 239-40 (explicating due process principles under the Due Process Clause and Article I, Paragraph 1 of the New Jersey Constitution).

In sum, we hold the Internet restrictions to be constitutional on their face, and that they do not otherwise violate the law.

### III., IV., V.

**[At the direction of the court, the published version of this opinion omits Part III (which relates to the polygraph testing issue that has been referred for an evidentiary hearing), Part IV (which upholds the Halloween curfew), and Part V (which deems moot L.A.'s challenge to his previous electronic monitoring). See R. 1:36-3.]**

### VI.

For the reasons noted, we (1) affirm the Parole Board's Internet restrictions, subject to potential as-applied challenges after exemptions are sought; (2) refer the polygraph issues for fact-finding; (3) uphold the Halloween curfew; and (4) dismiss as moot L.A.'s challenge to electronic monitoring.

Our jurisdiction is retained only as to the polygraph issues, pursuant to the supplementation procedures under Rule 2:5-5(b) that have been outlined in this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION