NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5283-12T3

STRATEGIC ENVIRONMENTAL
PARTNERS, LLC,

     Appellant,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

     Respondent.

_____

APPROVED FOR PUBLICATION

November 13, 2014

APPELLATE DIVISION

Argued September 8, 2014 — Decided November 13, 2014

Before Judges Sabatino, Simonelli and Leone.

On appeal from the New Jersey Department of Environmental Protection.

Matthew M. Fredericks argued the cause for appellant.

Robert J. Kinney, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Kinney and Aaron A. Love, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

SIMONELLI, J.A.D.

Appellant Strategic Environmental Partners, LLC (SEP), owner of the Fenimore Landfill (landfill) located in the

Township of Roxbury, appeals from a June 26, 2013 emergency order issued by the Commissioner of respondent New Jersey Department of Environmental Protection (Department). The order enjoined SEP from accepting any material onto the landfill without the Department's permission, and authorized the Department to immediately seize control of the landfill to abate an alleged imminent threat to the environment arising from continued emissions of hydrogen sulfide. Pursuant to the emergency order, the Department seized control of the landfill that same day and then undertook or oversaw various remedial measures.

For the reasons that follow, we vacate the emergency order, without prejudice, and remand to the Law Division for further proceedings. We do so because, as we explain, infra, the Department exceeded its authority under N.J.S.A. 13:1E-125.4 by seizing control of SEP's property without first securing judicial approval. The Department also erred in basing the emergency order retroactively on SEP's past hydrogen sulfide emissions by applying a statutory emissions standard that did not yet exist until the applicable statute was enacted the same morning the order was issued. Finally, the Department has yet to make the requisite showing to justify an emergency order under N.J.S.A. 13:1E-125.9.

On remand, the Department shall have the opportunity to present expert and other proof to the trial court to support the Commissioner's finding that the hydrogen sulfide emissions presented an imminent threat to the environment on June 26, 2013. In turn, SEP shall have the opportunity to present contrary evidence and attempt to meet its heavy burden under the statute to stay the Department's intervention. The trial court will then engage in appropriate fact-finding that will enable appropriate appellate review, should either or both parties thereafter seek it.

Lastly, we specifically reject SEP's contention that the new statute on which the Department relied in this case constitutes unconstitutional special legislation, and decline to address SEP's other constitutionally-based challenges to the Department's actions.

## I.

The following facts inform our review. The landfill is a 101-acre site. From the early 1950's to the late 1970's, approximately sixty acres were used as a solid waste landfill. The landfill ceased operating in 1977, but was never capped or closed.

In 2010, SEP purchased the property and planned to cap and close the landfill and install and operate a 10-megawatt solar

power generating facility using an array of photovoltaic panels. In October 2011, the Department approved a closure and post-closure plan for the landfill, which required SEP to close and maintain the landfill in accordance with the requirements of the Solid Waste Management Act (SWMA), N.J.S.A. 13:1E-1 to -99.47, and included certain conditions and a plethora of other plans, schedules, and documents (the closure plan).[1]

The closure plan permitted SEP to accept approved fill material onto the landfill in order to create the topography and stratigraphy[2] suitable for installation of large solar panels. Regarding odor control, the closure plan provided as follows:

> The closure activities shall not cause any air contaminant to be emitted in violation of N.J.A.C. 7:27-5.2(a). Malodorous emissions shall be controlled by the use of daily cover. In the event that this is not satisfactory, a suitable deodorant as approved and permitted by the Department's Air [Quality] Program shall be used or the Department shall require a change in the type of recyclable materials accepted. Malodorous solid waste shall be covered immediately after excavation, unloading or redeposition with a minimum of six inches of cover material or approved alternative material.

---

[1] The closure plan contemplated a forty-eight-month, four-phased process commencing in October 2011 and ending in October 2015.

[2] "Stratigraphy" is defined as "geology that deals with the origin, composition, distribution, and succession of strata." Merriam Webster's Collegiate Dictionary 1163 (10th ed. 1997).

The Department and SEP executed an administrative consent order in October 2011, which memorialized the closure plan (the consent order). If SEP violated any condition, the consent order permitted the Department to terminate the closure plan unilaterally upon written notice to SEP and take immediate action or seek injunctive relief to protect the public health, safety, or welfare.

By 2012, the Department determined that SEP had not complied with certain conditions of the closure plan. On May 14, 2012, the Department terminated the consent order and notified SEP it intended to revoke the closure plan. On May 18, 2012, the Department ordered SEP to immediately cease receiving fill material onto the landfill and warned it would take immediate legal action if SEP failed to comply. In response, on May 21, 2012, SEP filed a verified complaint and order to show cause (OTSC) in the Chancery Division, seeking to enjoin the Department from taking any action.

Prior to May 2012, SEP accepted approved fill material onto the landfill, including significant amounts of ground gypsum board, such as wallboard. In November 2012, anaerobic decomposition of the ground gypsum board began generating large volumes of hydrogen sulfide, which emanated from the landfill. Hydrogen sulfide is an odorous, noxious, colorless, poisonous,

flammable gas that produces a "rotten egg" odor. Hydrogen sulfide is not on the list of New Jersey air toxics, see N.J.A.C. 7:27-21.1, and the New Jersey Department of Health (DOH) has determined that hydrogen sulfide has not been shown to cause cancer in humans, and its possible ability to cause cancer in animals has not been studied thoroughly. Similarly, based on available data, the DOH does not believe there would be long-term adverse health effects from the emission of hydrogen sulfide. However, for some individuals, hydrogen sulfide may cause eye, nose, and throat irritations, headaches, and nausea, as well as aggravate pre-existing respiratory issues.

In mid-November 2012, the Department began receiving complaints from individuals living near the landfill about the "rotten egg" odor and symptoms of irritated nose, throat, eyes, and skin, nausea, asthmatic events, and headaches.[3] The Department investigated and determined that hydrogen sulfide emanating from the landfill was the cause of the odor.

On December 10, 2012, the parties appeared before the Chancery Division judge who was then handling the case. The judge declined to restrain SEP from accepting fill material onto the landfill or permit the Department from taking any action,

---

[3] From mid-November 2012 to January 2013, the Department received over six hundred complaints.

finding there was no expert evidence of a toxic concentration of hydrogen sulfide emanating from the landfill. Instead, the judge ordered SEP to properly cover the landfill with soil within forty-eight hours and import and store enough extra soil to thereafter cover any exposed areas at the end of each workday.

The judge also appointed an environmental expert to determine whether the hydrogen sulfide emissions constituted a threat to public health. The court-appointed expert subsequently issued a report, as did the Department. Both reports concluded that the hydrogen sulfide emissions caused the "rotten egg" odor. Although the Department determined the hydrogen sulfide emissions were at improper levels, neither the Department nor the court-appointed expert concluded this posed an imminent threat to the environment or public health and safety.

The Department later determined that SEP had not complied with the odor-control provision of the closure plan or with the Chancery judge's order to properly cover the landfill. Beginning on December 28, 2012, the Department issued numerous administrative orders and notices of civil administrative penalty assessment against SEP. The orders stated that SEP repeatedly violated the New Jersey Air Pollution Control Act,

N.J.S.A. 26:2C-1 to -36, and N.J.A.C. 7:27-5.2(a)[4] by permitting odors to emanate from the landfill into the outdoor atmosphere in quantities causing air pollution.

The record does not reveal there were any further proceedings in the Chancery Division matter. However, on December 31, 2012, two Township residents filed a class action complaint and OTSC against SEP in the Law Division, alleging the maintenance of the landfill and foul odor emanating therefrom constituted a nuisance that should be enjoined. Thereafter, in January 2013, the Department initiated ambient air monitoring near the landfill to obtain hydrogen sulfide readings. Thirty-minute block readings indicated that hydrogen sulfide was emanating from the landfill at levels exceeding the olfactory threshold of 8 parts per billion (ppb).[5] At the time the Department took these readings, there were no standards for hydrogen sulfide emissions in New Jersey.

The Department was joined as a third-party defendant in the Law Division matter, and filed an OTSC seeking a judgment permitting it to immediately seize control of the landfill in

---

[4] N.J.A.C. 7:27-5.2(a) provides that "no person shall cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution."

[5] The level at which an odor is detectable to the olfactory senses in the ambient air is around 8 ppb.

order to alleviate the hydrogen sulfide emissions, among other things. The Law Division judge set June 28, 2013 as the return date. Before the return date, on June 26, 2013, Governor Christie signed new legislation governing the closure of over six hundred legacy landfills, codified at N.J.S.A. 13:1E-125.1 to -125.9 (the Legacy Landfill Law).[6]

The Legacy Landfill Law established 30 ppb averaged over a thirty-minute period as the standard for hydrogen sulfide emissions from a legacy landfill. N.J.S.A. 13:1E-125.4(a). Upon the Department verifying complaints about hydrogen sulfide odors and determining the odors emanated from a legacy landfill, the Legacy Landfill Law authorizes the Department to require the owner or operator to take certain corrective action. N.J.S.A. 13:1E-125.4(b)(1)-(4). If the Department finds a violation of

---

[6] The Legacy Landfill Law also governs sanitary landfill facilities and closed sanitary landfill facilities. N.J.S.A. 13:1E-125.1. It defines a "legacy landfill" as follows:

> a landfill that ceased operations prior to January 1, 1982, and received for disposal: (1) solid waste; or (2) waste material that was received for disposal prior to October 21, 1976 and that is included within the definition of hazardous waste adopted by the federal government pursuant to the "Resource Conservation and Recovery Act, [42 U.S.C.A. §§ 6901 to 6992k].
>
> [N.J.S.A. 13:1E-125.1.]

the hydrogen sulfide standard, it may institute an action or proceeding in the Superior Court for injunctive and other relief. N.J.S.A. 13:1E-125.4(c). The court may proceed in a summary manner and grant temporary or interlocutory relief. Ibid. If the court finds a violation, it "shall require the owner or operator of the legacy landfill . . . to abate the violation immediately and may require that wastes or materials be mixed, rolled, or covered, or that odor shields be installed to abate the violation." Ibid. The court may also enter "a temporary or permanent injunction that requires that the wastes or materials that are the source of the violation be mixed, covered, or removed," or assess costs or damages against the violator. N.J.S.A. 13:1E-125.4(c)(1)-(5).

The Legacy Landfill Law authorizes the Commissioner to issue an emergency order as follows:

> If the commissioner determines that any activity or activities occurring at a legacy landfill or closed sanitary landfill facility present an imminent threat to the environment or public health and safety, the provisions of [N.J.S.A. 13:1E-9.5] shall govern the issuance of and any challenge to, any emergency order issued by the commissioner to the owner or operator of a legacy landfill or closed sanitary landfill facility.
>
> [N.J.S.A. 13:1E-125.9 (emphasis added).]

A-5283-12T3

N.J.S.A. 13:1E-9.5 governs a challenge to an emergency order, and provides as follows:

> Any action brought by a person seeking a temporary or permanent stay of an emergency order issued pursuant to this section shall be brought in the Superior Court. Any person bringing such an action shall have the burden of demonstrating, by clear and convincing evidence, that the activity or activities specified in the emergency order as presenting an imminent threat to the environment or public health and safety do not present an imminent threat to the environment or public health and safety.
>
> [N.J.S.A. 13:1E-9.5(c) (emphasis added).]

On June 26, 2013, the Commissioner issued an emergency order pursuant to N.J.S.A. 13:1E-9.5(c) and -125.9. The Commissioner asserted that N.J.S.A. 13:1E-125.9 empowered him to abate violations of the hydrogen sulfide standards established by N.J.S.A. 13:1E-125.4(a). The Commissioner noted there were recorded hydrogen sulfide levels near the landfill exceeding the 30 ppb standard the "last several weeks" and thirty-minute average readings exceeding the 30 ppb standard on June 9 and 15, 2013. The Commissioner declared that "the [l]andfill's continued and repeated emission of hydrogen sulfide in violation of the environmental standard established by [N.J.S.A. 13:1E-125.4], combined with [SEP's] repeated failure to abate and mitigate the environmental harm . . . pose[d] an imminent threat to the environment." The Commissioner enjoined SEP from

11

accepting fill material onto the landfill without the Department's express permission, and authorized the Department to seize control of the landfill "to take immediate action to abate the escape of hydrogen sulfide from the [landfill]." The Department seized control of the landfill on June 26, 2013, within thirty minutes of when Governor Christie signed the new legislation.

SEP requested a stay of the emergency order, raising procedural, factual, and legal challenges. The Department denied a stay. This appeal followed.[7]

## II.

As a threshold matter, we address the jurisdictional issue. The parties do not dispute that this appeal is from a final state agency action. This court has exclusive jurisdiction to review final decisions or actions of a state agency or officer. R. 2:2-3(a)(2); see also Infinity Broad. Corp. v. N.J. Meadowlands Comm'n, 187 N.J. 212, 223 (2006) (holding that "'every proceeding to review the action or inaction of a state administrative agency [is] by appeal to the Appellate Division'") (quoting Cent. R.R. Co. v. Neeld, 26 N.J. 172, 184-

---

[7] At oral argument of this appeal, counsel advised there are several lawsuits pending in State and federal trial courts relating to this matter and involving some or all of the same parties.

85, cert. denied, 357 U.S. 928, 78 S. Ct. 1373, 2 L. Ed. 2d 1371 (1958)). This court also has exclusive jurisdiction "where it appears to have concurrent or overlapping jurisdiction with a trial court." Pressler & Verniero, Current N.J. Court Rules, comment 3.2.1 on R. 2:2-3 (2015). Accordingly, where a statute provides for review of agency action by the Superior Court, such as N.J.S.A. 13:1E-9.5(c), "that designation should be construed to refer to the Appellate Division of the Superior Court rather than a trial division." Ibid.

However, "the Appellate Division retains the discretion, in an appropriate case, to retain jurisdiction in an appeal from the action of a state agency, but to refer the matter to the Law Division or to the agency for such additional fact-finding as it deems necessary to a just outcome." Infinity Broad. Corp., supra, 187 N.J. at 227 (citations omitted). We may remand to the trial court for a plenary hearing where there was no mechanism for a hearing in the agency and no agency record on which to conduct a meaningful review. State Farm Mut. Auto. Ins. Co. v. N.J. Dep't of the Pub. Advocate, 227 N.J. Super. 99, 132-34 (App. Div. 1988), aff'd, 118 N.J. 336 (1990); Montclair Twp. v. Hughey, 222 N.J. Super. 441, 446-47 (App. Div. 1987). We conclude this court has jurisdiction to review the emergency

order, but remand to the Law Division for the reasons stated below.

We first conclude the Commissioner lacked authority to issue the emergency order based on a violation of the hydrogen sulfide standard established by N.J.S.A. 13:1E-125.4(a). Upon the Department verifying complaints and determining the landfill was the source of the hydrogen sulfide odor, N.J.S.A. 13:1E-125.4(b)(1)-(4) only authorized the Department to require SEP to take certain corrective action. Upon determining that SEP violated the hydrogen sulfide standard, N.J.S.A. 13:1E-125.4(c) only authorized the Department to institute an action in the trial court for injunctive and other relief. Only the court had the authority to order immediate abatement, corrective action, or temporary or permanent restraints. N.J.S.A. 13:1E-125.4(c)(1)-(5). No part of N.J.S.A. 13:1E-125.4 authorized the Department or Commissioner to enjoin SEP from receiving fill material onto the landfill or seize the landfill without first obtaining judicial approval.

New Jersey Department of Environmental Protection v. Interstate Recycling, Inc., 267 N.J. Super. 574, 577-78 (App. Div. 1993), on which the Department relies, does not change this result, but rather, supports it. In Interstate Recycling, the operator of a solid waste facility ignored the Department's

notices of violation of the SWMA. Id. at 575. Following a plenary hearing in the Chancery Division, the court found the operator violated the SWMA, and restrained the operator from operating the facility. Ibid. Ultimately, the court held that the Department's decision to institute an action in the Superior Court for injunctive relief applied "where a state agency charged with environmental enforcement seeks to enjoin repeated violations of the police power statute." Id. at 577-78 (citing N.J.S.A. 13:1E-9(d)).

Here, regardless of when the hydrogen sulfide violations were alleged to have occurred, N.J.S.A. 13:1E-125.4 did not authorize the Commissioner to issue an emergency order coram non judice for a violation of N.J.S.A. 13:1E-125.4(a). The Department could only direct SEP to take certain corrective action, N.J.S.A. 13:1E-125.4(b)(1)-(4), or initiate an action in the trial court, N.J.S.A. 13:1E-125.4(c). Neither the Commissioner nor the Department had authority to issue an emergency order enjoining SEP's activities on the landfill or seizing control of the landfill without judicial action merely because of a violation of the hydrogen sulfide standard in N.J.S.A. 13:1E-125.4(a).

Even if the Commissioner had such authority, any action predicated on N.J.S.A. 13:1E-125.4(a), or the Legacy Landfill

Law in general, constituted an unlawful retroactive application. There was no evidence that SEP violated N.J.S.A. 13:1E-125.4(a) when the statute was actually in effect. Accordingly, using violations against SEP that occurred before the statute became effective required unlawful retroactive application. See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 559 (2014) (applying two-part retroactive analysis for a statute passed five months after the issuance of an insurance policy and two months after the accident prompting litigation).

Generally, the law favors prospective, rather than retroactive, application of new legislation unless a recognized exception applies. Id. at 556, 563. "The preference for prospective application of new legislation 'is based on [the Court's] long-held notions of fairness and due process.'" Id. at 563 (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 45 (2008)).

Courts must apply a two-part test to determine whether a statute could be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and (2) whether retroactive application "will result in either an unconstitutional interference with vested rights or a manifest injustice." Ibid. (quoting In re D.C., 146

16                                                        A-5283-12T3

N.J. 31, 50 (1996) (quoting <u>Phillips v. Curiale</u>, 128 <u>N.J.</u> 608, 617 (1992))).

Under the first part of the <u>James</u> two-part test, there are "three circumstances that will justify giving a statute retroactive effect: (1) when the Legislature expresses its intent that the law apply retroactively, either expressly or implicitly; (2) when an amendment is curative; or (3) when the expectations of parties so warrant." <u>Ibid.</u> (citations omitted).

Under the first circumstance, the Legislature may demonstrate its intent to retroactively apply a statute by stating so in the language of the statute or legislative history, or by implication. <u>Id.</u> at 564 (citing <u>Gibbons v. Gibbons</u>, 86 <u>N.J.</u> 515, 522 (1981)). If the legislation expressly states it is to be applied retroactively, such intent should be given effect "absent a compelling reason not to do so." <u>Ibid.</u> Implied intent, however, "may be found from the statute's operation when retroactive application is necessary to fulfill legislative intent," or otherwise "'necessary to make the statute workable or to give it the most sensible interpretation.'" <u>Ibid.</u> (quoting <u>Gibbons</u>, <u>supra</u>, 86 <u>N.J.</u> at 522).

Here, the Legislature expressly provided only one instance where the Legacy Landfill Law would apply retroactively.

Specifically, N.J.S.A. 13:1E-125.2 provides that an administrative consent order entered into before or after the law's effective date shall be voidable for any of the enumerated reasons. Other than this provision, the Legacy Landfill Law does not refer to any retroactive application, and the present tense of the language in the statute generally suggests only prospective application. Although N.J.S.A. 13:1E-125.2 allows pre-existing administrative consent orders to be voidable from particular future actions, this provision does not remotely suggest or imply that any and all hydrogen sulfide emissions that have ever occurred are subject to that statute.

Under the second circumstance, a statute may be applied retroactively if it is "curative," meaning "designed to 'remedy a perceived imperfection in or misapplication of a statute.'" James, supra, 216 N.J. at 564 (quoting Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 386 (App. Div. 1992), aff'd, 131 N.J. 400 (1993)). "'Generally, curative acts are made necessary by inadvertence or error in the original enactment of a statute or in its administration.'" Ibid. To be considered curative, however, the statute must "'not alter the act in any substantial way, but merely clarif[y] the legislative intent behind the [previous] act.'" Ibid. (second alteration in original) (quoting 2nd Roc-Jersey Assocs. v. Town of Morristown,

158 <u>N.J.</u> 581, 605 (1999)) (citing <u>Schiavo</u>, <u>supra</u>, 258 <u>N.J. Super.</u> at 386).

The Legacy Landfill Law is not an amendment to an existing law on legacy landfills; rather, it is entirely new legislation designed to regulate legacy landfills, sanitary landfill facilities, and closed sanitary landfill facilities. <u>N.J.S.A.</u> 13:1E-125.1. The Legacy Landfill Law creates an entirely new body of legislation and does more than "'merely clarif[y] the legislative intent'" behind the SWMA. <u>James</u>, <u>supra</u>, 216 <u>N.J.</u> at 564 (quoting <u>2nd Roc-Jersey Assocs.</u>, <u>supra</u>, 158 <u>N.J.</u> at 605). Accordingly, the "curative" justification does not apply to the Legacy Landfill Law.

Lastly, under the third circumstance, absent clear intent for prospective application, the parties' expectations may warrant retroactive application of the statute. <u>Id.</u> at 565 (citing <u>Gibbons</u>, <u>supra</u>, 86 <u>N.J.</u> at 523). In this case, while the Department may have expected retroactive application of the Legacy Landfill Law, SEP clearly had no such expectation and was relying on presenting its case to the Law Division judge.

Even assuming the Legislature clearly intended retroactive application of the Legacy Landfill Law, or the statute is clearly curative, the court must still consider the second part of the <u>James</u> test addressing whether retroactive application

will result in either an unconstitutional interference with vested rights or a manifest injustice. <u>Ibid.</u> This part "focuses on whether the parties relied on prior law to their detriment, such that retroactive application would cause a deleterious and irrevocable result." <u>Ibid.</u> (quoting <u>Innes v. Innes</u>, 117 <u>N.J.</u> 496, 511 (1990) (quoting <u>Gibbons</u>, <u>supra</u>, 86 <u>N.J.</u> at 523-24)) (internal quotation marks omitted).

Regardless of whether retroactive application of the Legacy Landfill Law was justified under one of the three aforementioned circumstances, there is certainly a manifest injury to SEP since it relied on presenting its case to the Law Division judge, as <u>N.J.S.A.</u> 13:1E-125.4(c) indeed requires. The issuance of the emergency order based on <u>N.J.S.A.</u> 13:1E-125.4(a) destroyed that opportunity. Accordingly, even if permissible under part one of the <u>James</u> test, retroactive application still fails part two because it "would cause a deleterious and irrevocable result." <u>Ibid.</u> (citations and internal marks quotations omitted). We, therefore, vacate the emergency order because it was partially based on <u>N.J.S.A.</u> 13:1E-125.4.

Although we conclude the Commissioner lacked authority to issue an emergency order pursuant to <u>N.J.S.A.</u> 13:1E-125.4, <u>N.J.S.A.</u> 13:1E-125.9 may have granted the Commissioner such authority in this case, but only if he found that SEP's

activities on the landfill presented an imminent threat to the environment or public health and safety. Here, the Commissioner found that SEP's failure to abate and mitigate the hydrogen sulfide posed an imminent threat to the environment. However, since the Commissioner could not premise this finding on SEP's violation of N.J.S.A. 13:1E-125.4(a), there had to be expert evidence establishing the hydrogen sulfide emissions presented an imminent threat to the environment on June 26, 2013, and an opportunity for SEP to challenge that evidence. Because the Legacy Landfill Law provides no mechanism for a hearing and there is no record on which we can conduct a meaningful review, we vacate the emergency order and remand to the Law Division for discovery, experts' reports, and a plenary hearing on the limited issue of whether the hydrogen sulfide emissions presented an imminent threat to the environment on June 26, 2013.[8] Infinity Broad. Corp., supra, 187 N.J. at 223; State Farm, supra, 227 N.J. Super. at 132-34 ; Montclair Twp., supra, 222 N.J. Super. at 446-47. If the Commissioner establishes a prima facie case, SEP must demonstrate, by clear and convincing

---

[8] Pursuant to Rule 2:5-5(b), we remand to the Law Division rather than the Department. We do so also because there are other lawsuits pending in the trial court involving the same parties and issues.

21

evidence, that the hydrogen sulfide emissions did not present an imminent threat to the environment. N.J.S.A. 13:1E-9-5(c).

## III.

Having reached the above conclusions, we need not address SEP's constitutional arguments that the Department's seizure of the landfill deprived SEP of due process and constituted an unlawful taking without just compensation. However, we address, and reject, SEP's contention that the Legacy Landfill Law constitutes unlawful special legislation aimed at the landfill.[9]

With any statute, courts presume the law is constitutional. State v. Ates, 217 N.J. 253, 268 (2014) (citations omitted), cert. denied, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (2014). The challenger of a statute "must shoulder the burden to overcome that strong presumption." Ibid. Courts "will afford every possible presumption in favor of an act of the Legislature" when reviewing State statutes for constitutionality. Town of Secaucus v. Hudson Cnty. Bd. of Taxation, 133 N.J. 482, 492 (1993), cert. denied, 510 U.S. 1110, 114 S. Ct. 1050, 127 L. Ed. 2d 372 (1994).

---

[9] Prior to passing the Legacy Landfill Law, the Legislature considered, but did not pass, a bill that only concerned the landfill. Instead, the Legislature passed the Legacy Landfill Law, which governs hundreds of landfills, including landfills closed before January 1, 1982.

"Where alternative interpretations of a statute are equally plausible, the view sustaining the statute's constitutionality is favored."  Ibid.  "Only a statute 'clearly repugnant to the constitution' will be declared void."  Id. at 492-93 (quoting Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222-23 (1985)).  No statute can authorize unconstitutional practices, and when a statute and the constitution conflict, "the statute must give way."  Id. at 493 (citing Twp. of W. Milford v. Van Decker, 120 N.J. 354, 357 (1990)).

The New Jersey Constitution mandates that "[t]he Legislature shall not pass any private, special or local laws." N.J. Const. art. IV, § VII.  As our Supreme Court has held,

> [f]rom a constitutional standpoint, a law is regarded as special legislation when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate.  The test of a special law is the appropriateness of its provisions to the objects that it excludes.
>
> [Secaucus, supra, 133 N.J. at 494 (quoting Town of Morristown v. Woman's Club of Morristown, 124 N.J. 605, 622 (1991)) (other citations and internal quotation marks omitted).]

The Court established a three-part test for determining whether a statute constitutes special legislation:

> [W]e first discern the purpose and object of the enactment.  We then undertake to apply

> it to the factual situation presented. Finally we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.
>
> [Vreeland v. Byrne, 72 N.J. 292, 300-01 (1977).]

For the first step, to determine the rational purpose for a statute under a constitutional challenge, the court is not limited to the stated purpose of the legislation and "'should seek any conceivable rational basis.'" Secaucus, supra, 133 N.J. at 494-95 (quoting Mahwah v. Bergen Cnty. Bd. of Taxation, 98 N.J. 268, 283, cert. denied, 471 U.S. 1136, 105 S. Ct. 2677, 86 L. Ed. 2d 696 (1985)).

Each provision of the Legacy Landfill Law had an obvious legitimate purpose. The legislation's ultimate goal was to protect the public and environment from harm and nuisance related to legacy landfills, sanitary landfill facilities, and closed sanitary landfill facilities. N.J.S.A. 13:1E-125.1. The overarching goal of limiting public contamination from these facilities is consistent with the Department's purpose of working for "conservation of the natural resources of the State, the promotion of environmental protection[,] and the prevention of pollution of the environment of the State." N.J.S.A. 13:1D-9. All the provisions of the Legacy Landfill Law, which govern

management of administrative consent orders, site plan approval, hydrogen sulfide emissions, financial assurance for post-closure activities, escrow for post-closure monitoring costs, licensed professional engineer oversight, remedies in the event of a violation, and the issuance of emergency orders for imminent threats, all serve the general legitimate purpose of preserving the environment. N.J.S.A. 13:1E-125.2.

Under the second Vreeland step, the court must apply the law to the factual context to determine whether exclusions from the statute's applications can be identified. Secaucus, supra, 133 N.J. at 510 (Stein, J., dissenting). Whether a statute constitutes special legislation generally turns on "'what is excluded and not what is included.'" Id. at 511 (Stein, J., dissenting) (quoting Newark Superior Officers Ass'n, supra, 98 N.J. at 223). As the Court stated,

> the Legislature has wide discretion in determining the perimeters of a classification, distinctions may be made with substantially less than mathematical exactitude, and an adequate factual basis for the legislative judgment is presumed to exist. We must also be mindful of the strong presumption in favor of constitutionality, and the traditional judicial reluctance to declare a statute void, a power to be delicately exercised unless the statute is clearly repugnant to the Constitution.

[Paul Kimball Hosp., Inc. v. Brick Twp. Hosp., Inc., 86 N.J. 429, 446-47 (1981) (citations omitted).]

The Legacy Landfill Law serves the legitimate governmental purposes described under the first Vreeland step without any exclusions worthy of overriding the presumption in favor of constitutionality. The Legacy Landfill Law generally covers all legacy landfills governed by the SWMA, not just the landfill at issue here. N.J.S.A. 13:1E-125.1. The law's provisions are not so specific to the landfill or SEP that other communities with legacy landfills could not come within its scope. There are over six hundred legacy landfills across the State subject to the Legacy Landfill Law. Considering the breadth of facilities the law governs, SEP's contention that it only applies to the landfill lacks merit.

Finally, under the third Vreeland step, the court must determine whether "the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act." Vreeland, supra, 72 N.J. at 301. In this case, the broad classification of a legacy landfill fits within the broad scheme of the SWMA for the Department to manage and regulate the State's management of solid waste. Classifying a particular type of landfill facility, which is common throughout the State, to be subject to

a particularized set of statutes and regulations serves the purpose of allowing the Department to "conserv[e] . . . the natural resources of the State, . . . promot[e] . . . environmental protection[,] and . . . prevent[] . . . pollution of the environment of the State." N.J.S.A. 13:1D-9. The Legacy Landfill Law rationally and effectively meets these goals, and the classification of legacy landfills is rationally related to the purpose and object of the law and the SWMA in general. Accordingly, we conclude that the Legacy Landfill Law does not constitute unlawful special legislation aimed at the landfill.

Because it is possible that, on remand, the parties may resolve this dispute conclusively on non-constitutional grounds, we decline to address at this time other constitutional issues raised by SEP. As a general rule, our courts strive to avoid reaching constitutional issues unless they are "'imperative to the disposition of litigation.'" Comm. to Recall Robert Menendez v. Wells, 204 N.J. 79, 96 (2010) (quoting Randolph Twp. Ctr., L.P. v. Cnty. of Morris, 186 N.J. 78, 80 (2006)). The trial court's forthcoming factual findings concerning the emergency order may also bear on any constitutional analysis that may be required if the case is litigated further. See J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327, 330-31 (App. Div. 2013), certif. denied sub nom., B.M. v. N.J. State Parole Bd.,

27                                                    A-5283-12T3

217 N.J. 296 (2014) (remanding to the trial court certain fact-finding functions in order to evaluate the appellant's constitutionally-based challenge to a State agency's actions).

Affirmed in part as to the claim of unconstitutional special legislation; otherwise vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.[10] If either party is aggrieved by the trial court's determinations following a plenary hearing and fact-finding, that party may file a new appeal with this court.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] Although Infinity Broad. Corp., supra, 187 N.J. at 227, suggests that the appellate court can retain jurisdiction while fact-finding occurs in the trial court, we discern no practical imperative to do so in this case. For one thing, it is not yet clear which party may be a future appellant, depending on the outcome of the remand. In addition, the trial court may choose in its discretion to consolidate the present litigation with some or all of the other pending related cases involving the landfill. If such consolidation occurs, it is conceivable that additional parties other than the Department and SEP may seek appellate review at the same time. The uncertain future dimensions of both this case and the related cases makes it preferable that fresh appeals be filed, if in fact further appellate review is sought.