SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**J.B./L.A./B.M./W.M./R.L. v. New Jersey State Parole Board (A-81/82/83-15) (077235)**

**Argued January 17, 2017 -- Decided May 8, 2017**

**FERNANDEZ-VINA, J., writing for a unanimous Court.**

Petitioners L.A., R.L., and W.M. (parolees) challenge the constitutionality of the practices of the New Jersey State Parole Board (Parole Board) in administering polygraph examinations to sex offenders serving either parole supervision for life (PSL) or community supervision for life (CSL) sentences.

The parolees' circumstances are substantially the same. All have been convicted of a sexual offense, have completed their respective prison terms, and are now being monitored by the Parole Board as offenders subject to either PSL or its statutory predecessor, CSL. As part of the Parole Board's monitoring, the parolees were each required to submit to a polygraph examination to monitor compliance with the conditions of parole.

After the Parole Board notified the parolees that they were subject to polygraph examination, the parolees each objected. The Parole Board rejected each of the parolees' administrative appeals. The individual parolees appealed the Parole Board's decisions. Because the record contained insufficient evidence to assess the purported therapeutic and rehabilitative value of polygraph examinations, the Appellate Division referred that issue to the trial court for supplemental proceedings.

Following an evidentiary hearing at which several expert witnesses testified, the trial court ultimately found that there is enough support in the record to conclude that there is a reasonable basis for using polygraph testing in the supervision of sex offenders serving PSL and CSL sentences in the community. Although it recognized the controversy concerning polygraph examination accuracy, the trial court explained that the Parole Board exercises care in incorporating exam results into decision-making and never uses the results as the exclusive basis to justify a modification of parole. Further, the trial court found expert testimony indicating that polygraph examinations are a valuable tool in the therapeutic treatment of sex offenders to be particularly compelling.

The Appellate Division thereafter upheld the Parole Board's use of polygraph testing, subject to certain restrictions. 444 N.J. Super. 115, 123 (App. Div. 2016). Although it dismissed the parolees' constitutional concerns, the Appellate Division required the Parole Board to "enhance its regulations and practices to safeguard an offender's right to invoke his constitutional privilege against self-incrimination." Id. at 123. Specifically, the Appellate Division explained that the Parole Board should "spell out more clearly what uses of the polygraph testing are allowed and disallowed" consistent with the limitations on machine-generated test results mandated in the opinion. Id. at 161-62. The Appellate Division allowed six months for the Parole Board to adopt updated policies formally, through rule-making. Id. at 162. The Parole Board, in turn, adopted regulatory amendments that took effect on December 5, 2016.

The Court granted the parolees' petition for certification. 226 N.J. 213 (2016); 226 N.J. 214 (2016).

**HELD**: The Court affirms but modifies the Appellate Division's opinion. The Court upholds the Parole Board's use of polygraph testing with the same limitations as the Appellate Division, but adds that the Parole Board's regulations must be further supplemented to buttress the parolees' Fifth Amendment right against self-incrimination.

1. N.J.S.A. 30:4-123.88 provides that "[t]he State Parole Board . . . may administer . . . polygraph examinations in order to obtain information necessary for risk management and treatment and to reduce the offender's denial mechanisms," and that "[t]he results of the polygraph examination shall not be used as evidence in court to prove a violation of the special sentence of [CSL or PSL] or condition of discharge has occurred." Non-compliance with the requirements of the monitoring program is a third-degree crime. N.J.S.A. 30:4-123.94. (pp 12-13)

2. The Parole Board adopted regulations to implement the polygraph testing authorized by the Act. An offender's assigned parole officer may recommend administration of a polygraph examination. N.J.A.C. 10A:72-3.4(a). If a supervisor decides it is appropriate to administer a polygraph examination, then an offender receives notice at least thirty days before a scheduled examination. N.J.A.C. 10A:72-3.5(a). (pp 13-16)

3. Included with the notification is a disclosure form, which must detail the scope of the examination, the consequences of failure to cooperate with the examination, the consequences of voluntarily providing identifying information of any previously unreported victims or crimes, and an explanation of how authorities may utilize information learned during the examination. N.J.A.C. 10A:72-3.5(b); 10A:72-3.6(b). The polygraph examination process consists of three parts: a pre-examination interview, the polygraph examination itself, and a post-examination interview. N.J.A.C. 10A:72-3.7(a). (pp 16-17)

4. Effective December 2016, the regulations provide that the results of any portion of the polygraph examination "may be used for therapeutic treatment purposes." N.J.A.C. 10A:72-3.6(b)(6); 10A:72-3.9(c). However, the machine-generated results of the polygraph examination "shall not be relied on or cited as evidence to support the filing of criminal charges or to justify the imposition or modification of sanctions," N.J.A.C. 10A:72-3.6(b)(7); 10A:72-3.9(d), or "used as evidence in court to prove that a violation of the special sentence of community or parole supervision for life or condition of discharge has occurred." N.J.A.C. 10A:72-3.6(b)(9); 10A:72-3.9(f). (pp. 17-18)

5. In Minnesota v. Murphy, 465 U.S. 420 (1984), the United State Supreme Court considered whether a statement made by a probationer to a probation officer without prior Miranda warnings could be admissible in a subsequent criminal proceeding. The Supreme Court found that it is permissible for a State to require a probationer to appear and discuss matters that affect his probationary status. However, the Supreme Court went on to explain that "[t]he result may be different if the questions put to the probationer . . . call for answers that would incriminate him in a pending or later criminal prosecution," or "if the State, either expressly or by implication, asserts that invocation of the [Fifth Amendment] privilege would lead to revocation of probation." Ibid. In such a case, "the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." Ibid. (pp 19-21)

6. The Parole Board's revised polygraph regulations substantially adhere to those principles, and the polygraph examination is not a custodial interrogation. The Court rejects the parolees' claim that they have a right to the presence of counsel during a polygraph examination and upholds the use of information obtained from pre- and post-examination interviews to support the filing of criminal charges or the imposition of sanctions. The Court is not convinced that the current regulations fully inform parolees of the scope of their right to remain silent during the polygraph examination process, however. (pp 21-24)

7. Parolees are advised "[t]hat the valid exercise of the right to remain silent does not constitute failure to fully participate and/or cooperate with the examination," but there is no explanation of what constitutes a "valid" exercise of that right. N.J.A.C. 10A:72-3.6(b)(5) (emphasis added). Because "failure to fully participate and cooperate with the examination" constitutes a third-degree crime, N.J.S.A. 30:4-123.94, the current disclosures create a situation in which the parolees' right to remain silent is impermissibly encumbered by pressure to avoid additional criminal charges for failing to cooperate. See Murphy, supra, 465 U.S. at 435. The Court therefore instructs the Parole Board to clarify that an offender validly invokes the right to remain silent pursuant to N.J.A.C. 10A:72-3.6(b)(5), without consequence, if the answer to any question asked throughout any portion of the examination process as defined in N.J.A.C. 10A:72-3.7(a) could form the basis of an independent criminal investigation. (pp. 24-26)

8. The State has a significant interest in ensuring adherence to the restrictive conditions imposed pursuant to PSL and CSL to protect the public from recidivism by defendants convicted of serious sexual offenses that outweighs the parolees' limited right to privacy. Addressing the parolees' challenge to the Parole Board regulations as arbitrary and capricious, the Court concludes that the parolees have not shown that it should set aside the Parole Board's regulatory scheme. (pp. 26-31)

      The judgment of the Appellate Division is **AFFIRMED as MODIFIED**. The Court instructs the Parole Board to issue revised regulations consistent with this opinion.

      **CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.**

2

J.B.,

     Appellant,

        v.

NEW JERSEY STATE PAROLE
BOARD,

     Respondent.

_____

L.A.,

     Appellant,

        v.

NEW JERSEY STATE PAROLE
BOARD,

     Respondent.

_____

B.M.,

     Appellant,

        v.

NEW JERSEY STATE PAROLE
BOARD,

     Respondent.

_____

W.M.,

     Appellant,

        v.

1

NEW JERSEY STATE PAROLE
BOARD,

     Respondent.
_____

R.L.,

     Appellant,

        v.

NEW JERSEY STATE PAROLE
BOARD,

     Respondent.


        Argued January 17, 2017 – Decided May 8, 2017

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 444 N.J. Super. 115 (App. Div.
        2016).

        Michael C. Woyce argued the cause for
        appellants L.A., W.M., and R.L. (Murphy &
        Woyce, attorneys).

        Daniel M. Vannella, Deputy Attorney General,
        argued the cause for respondent (Christopher
        S. Porrino, Attorney General of New Jersey,
        attorney; Lisa A. Puglisi, Assistant
        Attorney General, of counsel; Mr. Vannella
        and Christopher C. Josephson, Deputy
        Attorney General, on the letter briefs).

        Fletcher C. Duddy, Deputy Public Defender,
        argued the cause for intervenor New Jersey
        Office of the Public Defender (Joseph E.
        Krakora, Public Defender, attorney).


     JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

Petitioners L.A., R.L., and W.M. (parolees) challenge the constitutionality of the practices of the New Jersey State Parole Board (Parole Board) in administering polygraph examinations to sex offenders serving either parole supervision for life (PSL) or community supervision for life (CSL) sentences pursuant to N.J.S.A. 2C:43-6.4.

The parolees are all convicted sex offenders who have been released into the community subject to monitoring by the Parole Board. For substantially similar reasons, they object to the administration of periodic polygraph examinations, which are required under the terms of their parole. The parolees raise constitutional claims based on the Fifth Amendment privilege against self-incrimination, the Sixth Amendment right to counsel, and constitutional privacy interests. They also contend that the Parole Board's regulations are arbitrary and capricious.

The Appellate Division upheld the Parole Board's use of polygraph examinations but directed the Parole Board to adopt revised regulations to explain more clearly that the machine-generated test results cannot be used as evidence to support independent criminal charges or to impose additional sanctions.

For the reasons set forth in this opinion, we affirm but modify the Appellate Division's opinion. We uphold the Parole Board's use of polygraph testing with the same limitations as

3

the Appellate Division, but add that the Parole Board's regulations must be further supplemented to buttress the parolees' Fifth Amendment right against self-incrimination.

I.

A.

The parolees' circumstances are substantially the same. All have been convicted of a sexual offense, have completed their respective prison terms, and are now being monitored by the Parole Board as offenders subject to either PSL or its statutory predecessor, CSL.  See N.J.S.A. 2C:43-6.4.  As part of the Parole Board's monitoring, the parolees were each required to submit to a polygraph examination to monitor compliance with the conditions of parole.

After the Parole Board notified the parolees that they were subject to polygraph examination, the parolees each objected to polygraph testing.  In their administrative appeals, the parolees raised constitutional claims and generally contended that the Parole Board's regulations were arbitrary and capricious.

The Parole Board rejected each of the parolees' administrative appeals.  In dismissing the parolees' Fifth Amendment claims, the Parole Board reasoned that polygraph tests do not require parolees to provide identifying information about any unreported victims or to incriminate themselves.  Regarding

4

the parolees' Sixth Amendment claims, the Parole Board concluded that the right to counsel does not attach to a polygraph examination because it is a routine interview where the officer is merely determining the level of compliance with the terms of parole.

The Parole Board also concluded that administration of polygraph examinations was not contrary to the parolees' right to privacy because polygraph examinations are necessary for risk management and treatment and because examination results are not disclosed to the public. Finally, the Parole Board determined that sufficient credible evidence supported its polygraph regulations.

B.

The individual parolees appealed the Parole Board's decisions, and the Appellate Division addressed the appeals in a consolidated opinion. J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327 (App. Div. 2013) (JB I), certif. denied, 217 N.J. 296 (2014). Because the record contained insufficient evidence to assess the purported therapeutic and rehabilitative value of polygraph examinations, the Appellate Division referred that issue to the trial court for supplemental proceedings pursuant to Rule 2:5-5(b).[1] Id. at 330-31; see also J.B. v. N.J. State

---

[1] The parolees also challenged the Parole Board's restrictions on their access to social media or other comparable websites on the

5

Parole Bd., 444 N.J. Super. 115, 121-22 (App. Div. 2016) (JB II).

Following an evidentiary hearing at which several expert witnesses testified about the use of polygraph examinations for sex offenders on parole, Assignment Judge Mary C. Jacobson issued detailed findings of fact. JB II, supra, 444 N.J. Super. at 122. After meticulously discussing the proofs presented by both sides, the trial court ultimately found that "there is enough support in the record for this court to conclude that there is a reasonable basis for using polygraph testing in the supervision of sex offenders serving PSL and CSL sentences in the community." Id. at 142 (emphasis omitted).

The trial court based its conclusion on testimony from Parole Board officers as to the procedures governing the use of polygraph examinations, as well as expert testimony regarding the therapeutic value of such examinations. Although it recognized the controversy concerning polygraph examination accuracy, the trial court explained that the Parole Board exercises care in incorporating exam results into decision-making and never uses the results as the exclusive basis to justify a modification of parole. Id. at 143-44. Further, the

---

Internet. The Appellate Division upheld the Parole Board's Internet access restrictions. JB I, supra, 433 N.J. Super. at 330. Because we denied the parolees' petition for certification, that issue is not before us in this appeal.

6

trial court found expert testimony indicating that polygraph examinations are a valuable tool in the therapeutic treatment of sex offenders to be particularly compelling.  Id. at 145.

The Appellate Division thereafter upheld the Parole Board's use of polygraph testing, subject to certain restrictions.  Id. at 123.  Based on the trial court's factual findings, the Appellate Division recognized that polygraph testing "can assist parole officers and treatment professionals in making better-informed decisions as to supervision and treatment."  Ibid.

Acknowledging longstanding concerns about the inaccuracy of polygraph test results, the Appellate Division prohibited the Parole Board from using the "machine-generated technical results" as evidence to support the imposition of sanctions on parolees.  Ibid.; see State v. A.O., 198 N.J. 69, 83-84 (2009); State v. Domicz, 188 N.J. 285, 312-13 (2006); State v. McDavitt, 62 N.J. 36, 43-44 (1972); State v. Driver, 38 N.J. 255, 261 (1962).  The Appellate Division determined, however, that the Parole Board could continue to utilize "the substance of any admissions or other statements made by the offenders at a polygraph session" as the basis for additional sanctions on parolees.  JB II, supra, 444 N.J. Super. at 123.

The Appellate Division rejected the parolees' contention that the polygraph sessions are a form of custodial

7

interrogation requiring the administration of Miranda[2] warnings and the appointment of counsel. Id. at 160-61. Further, the Appellate Division noted the trial court's finding that polygraph examiners are instructed to provide Miranda warnings if "a parolee makes a spontaneous incriminating statement during the course of the polygraph examination." Id. at 160. With regard to the right to counsel, the Appellate Division reasoned that "the presence of counsel is likely to diminish the positive potential therapeutic benefits of the polygraph testing" and would "inject adversarial elements into the procedure." Id. at 161. The Appellate Division also rejected the parolees' claim that polygraph tests violate their right to privacy, observing that "[t]he offender on PSL or CSL must reveal his activities and plans to his parole officer as a matter of course during his monitoring." Id. at 151 n.13.

Although it dismissed the parolees' constitutional concerns, the Appellate Division required the Parole Board to "enhance its regulations and practices to safeguard an offender's right to invoke his constitutional privilege against self-incrimination." Id. at 123. Specifically, the Appellate Division explained that the Parole Board should "spell out more clearly what uses of the polygraph testing are allowed and

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

disallowed" consistent with the limitations on machine-generated test results mandated in the opinion. Id. at 161-62. The Appellate Division allowed six months for the Parole Board to adopt updated policies formally, through rule-making. Id. at 162. The Parole Board, in turn, adopted regulatory amendments that took effect on December 5, 2016. See 48 N.J.R. 769(a) (May 16, 2016); 48 N.J.R. 2612(b) (Dec. 5, 2016).

We granted the parolees' petition for certification. 226 N.J. 213 (2016); 226 N.J. 214 (2016).

## II.

### A.

The parolees argue that the Parole Board's polygraph program violates their constitutional right to privacy. In support of this claim, the parolees cite the highly intimate pre-interview questions routinely posed to parolees on such topics as their sexual relationships, masturbation habits, and sexual fantasies.

The parolees also assert that polygraph examinations constitute custodial interrogations because parolees must attend the examination or else risk criminal sanction, because failure to attend or cooperate is a third-degree crime. Moreover, the parolees point out that once the examination has begun, a parolee cannot leave the room.

9

Because the polygraph examinations constitute custodial interrogations, the parolees claim that a polygraph examiner must administer Miranda warnings at the beginning of a polygraph examination and that a parolee is entitled to have counsel present during an examination. The parolees also argue that the Parole Board's polygraph regulations implicate their Fifth Amendment privilege against self-incrimination. Citing N.J.A.C. 10A:72-3.6(b)(5), which allows a parolee to make a valid Fifth Amendment objection to a question without consequence, the parolees assert that a layperson cannot know what constitutes a valid objection, especially without a lawyer present.

B.

The Parole Board maintains that the parolees' constitutional claims lack merit because the Appellate Division properly prohibited the evidential use of technical, machine-generated polygraph results for altering the terms of parole. The Parole Board adds that it amended its regulations consistent with the Appellate Division's directive to explain more clearly the proper evidential uses of polygraph examination results, thus providing an additional safeguard to the constitutional rights of parolees.

The Parole Board argues that parolees have a diminished right to privacy and must reveal their activities regularly to parole officers to remain in compliance with the terms of their

10

parole. Because the questions posed during routine polygraph examinations do not delve deeper than what parolees must already disclose pursuant to their parole conditions, the Parole Board maintains the examination process does not violate parolees' right to privacy.

Finally, the Parole Board concurs with the Appellate Division's conclusion that polygraph examinations are not the equivalent of custodial interrogations. Accordingly, the Parole Board insists that Miranda warnings are not necessary in this setting and that parolees are not entitled to have counsel present. Citing its regulations, the Parole Board points out that parolees specifically do not have to divulge identifying information of any unreported victims or crimes. N.J.A.C. 10A:72-3.7(d). Therefore, the Parole Board argues, the regulations do not implicate parolees' Fifth Amendment privilege against self-incrimination.

C.

Intervenor Office of the Public Defender (Public Defender) endorses the Appellate Division's decision that the Parole Board cannot use the machine-generated technical results of polygraph exams as evidence to support parole modifications. The Public Defender further urges that the Parole Board's regulations be modified to bolster the parolees' right against self-incrimination. Highlighting questions that, it contends, could

11

lead to incriminating responses, the Public Defender argues that the regulations should make clear that parolees have a right to assert their Fifth Amendment privilege against any answer that could be a "link in the chain of evidence needed to prosecute" an independent crime.

## III.

We begin by reviewing the statutory and regulatory framework that governs the administration of polygraph tests to sex offenders serving PSL or CSL sentences, including the Parole Board's December 2016 amendments.

## A.

For decades, we have considered polygraph results to be unreliable as a "means of ascertaining truth or deception." McDavitt, supra, 62 N.J. at 44; see also Domicz, supra, 188 N.J. at 312 (noting the "lack of scientific consensus concerning the reliability of polygraph evidence"); Driver, supra, 38 N.J. at 261 (rejecting the admissibility of polygraph tests due to their unreliability). Accordingly, "[a]s a general rule, polygraph results are not admissible in evidence in New Jersey." A.O., supra, 198 N.J. at 83. We created a narrow exception to this rule to allow for the admission of polygraph evidence only if the parties both agree to allow such evidence in a stipulation that is "clear, unequivocal and complete, freely entered into with full knowledge of the right to refuse the test and the

12

consequences involved in taking it." McDavitt, supra, 62 N.J. at 46.

Despite our long-standing skepticism about the accuracy of polygraph examinations, the Legislature passed the Sex Offender Monitoring Pilot Project Act (Pilot Project Act) in 2005, N.J.S.A. 30:4-123.80 to -123.88, which authorized the use of polygraph testing of sex offenders subject to PSL or CSL. When most of the Pilot Project Act was repealed in 2007 and replaced with the Sex Offender Monitoring Act, N.J.S.A. 30:4-123.89 to -123.99, the polygraph provision was left in place. That statute provides that

> [t]he State Parole Board, on at least an annual basis, may administer to all offenders serving a special sentence of community or parole supervision for life . . . polygraph examinations in order to obtain information necessary for risk management and treatment and to reduce the offender's denial mechanisms. A polygraph examination shall be conducted by a polygrapher trained specifically in the use of the polygraph for the monitoring of sex offenders, where available, and shall be paid for by the offender. The results of the polygraph examination shall not be used as evidence in court to prove a violation of the special sentence of community or parole supervision for life or condition of discharge has occurred.
>
> [N.J.S.A. 30:4-123.88.]

Non-compliance with the requirements of the monitoring program is a third-degree crime. N.J.S.A. 30:4-123.94.

The Parole Board adopted regulations to implement the polygraph testing authorized by the Act.[3]  See N.J.A.C. 10A:71-6.11(b)(22); 10A:71-6.13; 10A:72-3.1 to -3.10.  The Parole Board's regulation outlining the polygraph program closely tracks the enabling statute:

> (a)  Pursuant to N.J.S.A. 30:4-123.88, the Board, on at least an annual basis, may administer to all offenders serving a special sentence of community or parole supervision for life . . . polygraph examinations in order to obtain information necessary for risk management and treatment and to reduce the offender's denial mechanisms.
>
> (b) A polygraph examination shall be conducted by a polygrapher trained specifically in the use of the polygraph for monitoring of sex offenders, where available, and shall be paid for by the offender.
>
> (c) The results of the polygraph examination shall not be used as evidence in court to prove that a violation of the special sentence of community or parole supervision for life or condition of discharge . . . has occurred.
>
> [N.J.A.C. 10A:71-6.13.]

Under the polygraph program, the Parole Board administers three types of polygraphs.  The Parole Board conducts an instant offense examination if a parolee denies guilt or gives a version

---

[3] In response to a court challenge brought by B.M., one of the parolees in this matter, the Parole Board adopted additional regulations codifying the internal practices governing the administration of polygraph examinations.

of the offense that "differs significantly from the official version of the commitment offense as noted in the pre-sentence report." N.J.A.C. 10A:72-3.3(a). Second, a periodic maintenance examination "verif[ies] the activities, behavior and truthfulness of an offender as related to compliance with the conditions of supervision." N.J.A.C. 10A:72-3.3(b). Finally, the Parole Board may administer a sexual history examination "to obtain comprehensive information regarding an offender's sexual interests and behaviors in order to identify the offender's predilections and to assist in case planning and treatment objectives." N.J.A.C. 10A:72-3.3(c).

An offender's assigned parole officer initially determines whether to administer a polygraph examination. The parole officer may recommend administration of a polygraph examination if the officer "has a reasonable belief that an offender is non-compliant with a condition(s) of supervision; if an offender denies guilt regarding the commitment offense; or if an offender's treatment provider believes that the administration of a polygraph examination would assist in the treatment or supervision of the offender." N.J.A.C. 10A:72-3.4(a). A supervisor must ultimately determine whether to administer a polygraph examination. N.J.A.C. 10A:72-3.4(b).

If a supervisor decides it is appropriate to administer a polygraph examination, then an offender receives notice at least

15

thirty days before a scheduled examination.  N.J.A.C. 10A:72-3.5(a).  Included with the notification is a disclosure form, which must detail the scope of the examination, the consequences of failure to cooperate with the examination, the consequences of voluntarily providing identifying information of any previously unreported victims or crimes, and an explanation of how authorities may utilize information learned during the examination.  N.J.A.C. 10A:72-3.5(b); 10A:72-3.6(b).  The form must also state that the offender has the "right to remain silent as it relates to divulging identifying information  of any unreported victim(s) or crime(s)," N.J.A.C. 10A:72-3.6(b)(4), and "[t]hat the valid exercise of the right to remain silent does not constitute failure to fully participate and/or cooperate with the examination," N.J.A.C. 10A:72-3.6(b)(5).

The polygraph examination process consists of three parts: a pre-examination interview, the polygraph examination itself, and a post-examination interview.  N.J.A.C. 10A:72-3.7(a).

During the pre-examination interview, the polygraph examiner discusses in detail the subject matter of the examination with the offender and determines whether a periodic maintenance examination or an instant offense examination is appropriate.  N.J.A.C. 10A:72-3.7(f)(5) to -(6).  The examiner also provides the offender with the disclosure form, ensures that the offender understands it, and requests that the offender

16

sign the form.  N.J.A.C. 10A:72-3.7(f)(1) to -(2).  If the offender refuses to sign the disclosure form or "indicate[s] that he or she does not understand the nature and purpose of the polygraph examination," the examiner consults with a supervisor to determine whether the examination should continue and notes "the basis for the offender's refusal to sign the disclosure form."  N.J.A.C. 10A:72-3.7(f)(2)-(3).

After the polygraph examination itself, the examiner must "review the test results with the offender, advise the offender of any significant, deceptive or inconclusive response to a polygraph examination question and provide the offender the opportunity to explain or resolve" those responses.  N.J.A.C. 10A:72-3.7(h)(2).  An interpreter may attend the polygraph examination "if deemed necessary by the polygraph examiner," but offenders are not entitled to have an attorney present during any portion of the examination process.  N.J.A.C. 72-3.7(e).

C.

Consistent with the Appellate Division's opinion in JB II, the Parole Board amended the regulations effective December 2016 to explain with more specificity how the Parole Board may use the information obtained during the examination process.  The regulations currently provide that the results of any portion of the polygraph examination "may be used for therapeutic treatment purposes."  N.J.A.C. 10A:72-3.6(b)(6); 10A:72-3.9(c).

17

Unlike responses provided in the pre- or post-examination phases of the process, however, the machine-generated results of the polygraph examination "shall not be relied on or cited as evidence to support the filing of criminal charges or to justify the imposition or modification of sanctions."  N.J.A.C. 10A:72-3.6(b)(7); 10A:72-3.9(d).  Further, the machine-generated results "shall not be used as evidence in court to prove that a violation of the special sentence of community or parole supervision for life or condition of discharge has occurred."  N.J.A.C. 10A:72-3.6(b)(9); 10A:72-3.9(f).  While those results cannot be used in court, "any voluntary admission(s) made by the offender regarding unreported victim(s) or crime(s)" must be reported to law enforcement.  N.J.A.C. 10A:72-3.9(b).

IV.

We now consider the parolees' constitutional challenges to the Parole Board's use of polygraph testing.  The parolees argue that because polygraph testing constitutes custodial interrogation, it impermissibly impinges upon their Fifth Amendment privilege against self-incrimination and their Sixth Amendment right to counsel.  The parolees also object to the use of polygraph testing as a violation of their constitutional right to privacy and due process under the First, Ninth, and Fourteenth Amendments.  The parolees invoke similar protections under the New Jersey Constitution.

18

Whether the Parole Board's use of polygraph testing intrudes upon the parolees' asserted constitutional rights is a legal question. Accordingly, we conduct a de novo review. State v. Pomianek, 221 N.J. 66, 80 (2015).

A.

We first turn to the parolees' claim that polygraph examinations amount to custodial interrogations. The parolees assert that the Parole Board's polygraph program implicates their constitutionally protected right against self-incrimination and their right to counsel.

1.

In deciding whether the polygraph examinations are tantamount to custodial interrogations, we are guided primarily by the United States Supreme Court's opinion in Minnesota v. Murphy, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). In Murphy, the Supreme Court considered whether a statement made by a probationer to a probation officer without prior Miranda warnings could be admissible in a subsequent criminal proceeding. Id. at 425, 104 S. Ct. at 1141, 79 L. Ed. 2d at 418.

At the outset of its reasoning in Murphy, the Supreme Court made clear that "[a] defendant does not lose [Fifth Amendment] protection by reason of his conviction of a crime." Id. at 426, 104 S. Ct. at 1141, 79 L. Ed. 2d at 418. Therefore,

19

"notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." Id. at 426, 104 S. Ct. at 1141-42, 79 L. Ed. 2d at 418.

In explaining the scope of the constitutional protections, the Supreme Court emphasized that "[t]he [Fifth] Amendment speaks of compulsion." Id. at 427, 104 S. Ct. at 1142, 79 L. Ed. 2d at 419 (alteration in original) (quoting United States v. Monia, 317 U.S. 424, 427, 63 S. Ct. 409, 410, 87 L. Ed. 376, 380 (1943)). After examining the differences between a routine parole interview and a custodial interrogation, the Supreme Court found that a parolee is not "'in custody' for purposes of receiving Miranda protection since there [is] no 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Id. at 430, 104 S. Ct. at 1144, 79 L. Ed. 2d at 421 (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275, 1279 (1983)). Accordingly, it is permissible for a State to "require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege." Id. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424; see also State v. Davis, 67

20

N.J. 222, 226 (1975) (stating Miranda is "not applicable to routine parole interview between parole officer and parolee"), cert. denied, 425 U.S. 943, 96 S. Ct. 1684, 48 L. Ed. 2d 187 (1976).

However, the Supreme Court went on to explain that "[t]he result may be different if the questions put to the probationer . . . call for answers that would incriminate him in a pending or later criminal prosecution." Murphy, supra, 465 U.S. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424. The Supreme Court found that it would be particularly problematic "if the State, either expressly or by implication, asserts that invocation of the [Fifth Amendment] privilege would lead to revocation of probation" because that would create "the classic penalty situation." Ibid. In such a case, "the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." Id. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424-25.

For the reasons discussed below, we find that the Parole Board's revised polygraph regulations substantially adhere to those principles. We agree that the polygraph examination is not a custodial interrogation requiring the administration of Miranda warnings prior to the start of the examination. While the parolees here are "subject to a number of restrictive conditions governing various aspects of [their] li[ves]," they

21

are not formally arrested prior to the start of the polygraph examination and their freedom of movement is not restricted to "the degree associated with a formal arrest." Id. at 430, 104 S. Ct. at 1144, 79 L. Ed. 2d at 421. Indeed, the testimony before the trial court indicated that the Parole Board attempts to avoid having the polygraph sessions resemble a formal interrogation to further the therapeutic value of the examination. JB II, supra, 444 N.J. Super. at 161. Although the examiner attaches parolees to a machine for the polygraph examination, parolees are not restrained with the same degree of physical restraint as a person who has been placed under arrest. Moreover, unlike a suspect who has been formally arrested, parolees do not face immediate detention for refusing to cooperate.

Given the narrow set of circumstances in which a Miranda warning must be given, we affirm the Appellate Division's conclusion that the polygraph examination is not a custodial interrogation. Because we conclude that a polygraph examination is not a custodial interrogation, we also reject the parolees' claim that they have a right to the presence of counsel during a polygraph examination. See A.O., supra, 198 N.J. at 81 ("[A]n accused's Sixth Amendment right to counsel does not attach until 'adversary judicial proceedings have been initiated against him.'" (quoting Rothgery v. Gillespie County, 554 U.S. 191, 214,

22

128 S. Ct. 2578, 2593, 171 L. Ed. 2d 366, 384 (2008) (Alito, J., concurring))). Therefore, we uphold the use of information obtained from pre- and post-examination interviews to support the filing of criminal charges or the imposition of sanctions. See N.J.A.C. 10A:72-3.6(b)(8); 10A:72-3.9(e).

We also find that many of the December 2016 changes to the regulatory framework successfully "spell out more clearly what uses of the polygraph testing are allowed and disallowed" in accordance with our long-standing skepticism of the reliability of polygraph examination results. JB II, supra, 444 N.J. Super. at 161-62; see A.O., supra, 198 N.J. at 83-84; Domicz, supra, 188 N.J. at 312-13; McDavitt, supra, 62 N.J. at 43-44; Driver, supra, 38 N.J. at 261. The revised regulations require that the pre-examination disclosure form explain that the Parole Board can use the machine-generated results of the polygraph examination for therapeutic treatment purposes only. N.J.A.C. 10A:72-3.6(b)(6), -(7), -(9). The Parole Board cannot use such results to support independent criminal charges, to impose sanctions, or as evidence that a parolee violated the terms of PSL or CSL. Ibid. Moreover, parolees must understand that the polygraph examiner will immediately report any voluntarily provided information regarding unreported victims or crimes to the appropriate law enforcement authorities for further investigation. N.J.A.C. 10A:72-3.6(b)(3); 10A:72-3.9(b).

Together, these disclosures adequately inform a parolee how the Parole Board may utilize information obtained during the examination process so parolees can decide whether to exercise their right to remain silent in response to a question posed during the examination process. We are not convinced that the Parole Board's current regulations fully inform parolees of the scope of their right to remain silent during the polygraph examination process, however.

2.

Parolees are advised on the form "[t]hat the valid exercise of the right to remain silent does not constitute failure to fully participate and/or cooperate with the examination," but there is no explanation of what constitutes a "valid" exercise of that right. N.J.A.C. 10A:72-3.6(b)(5) (emphasis added). Because "failure to fully participate and cooperate with the examination" constitutes a third-degree crime, N.J.S.A. 30:4-123.94, absent clarification, the current disclosures create a "classic penalty situation" in which the parolees' Fifth Amendment right to remain silent is impermissibly encumbered by pressure to avoid additional criminal charges for failing to cooperate. See Murphy, supra, 465 U.S. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424.

We are particularly concerned that parolees may not understand whether they may assert their Fifth Amendment

24

privilege in response to certain types of questions without facing consequences. The regulations protect "[t]he offender's right to remain silent as it relates to divulging identifying information of any unreported victim(s) or crime(s)." N.J.A.C. 10A:72-3.6(b)(4). Based on that instruction, it is not clear whether it is "valid" to assert Fifth Amendment privilege in response to a general question such as, "Have you had sexual contact with anyone without their consent?" The answer would not identify a particular victim or even offer any specific details of a crime; yet, if a parolee answered in the affirmative, the examiner would undoubtedly report the parolee's response to the appropriate authorities for further investigation. See N.J.A.C. 10A:72-3.9(b).

We therefore instruct the Parole Board to clarify that an offender validly invokes the right to remain silent pursuant to N.J.A.C. 10A:72-3.6(b)(5), without consequence, if the answer to any question asked throughout any portion of the examination process as defined in N.J.A.C. 10A:72-3.7(a) could form the basis of an independent criminal investigation. Consistent with the United States Supreme Court's holding in Murphy, supra, 465 U.S. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424, this clarification will ensure that parolees will not feel compelled to respond to questions that could yield potentially

25

incriminating answers in order to avoid criminal sanctions for failing to cooperate with the polygraph examination.

B.

Invoking Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), the parolees argue that the polygraph examination violates the privacy protections guaranteed by the First, Ninth, and Fourteenth Amendments.  The parolees object to invasive questions often posed during the examination requiring an offender to disclose typical sexual habits and fantasies and argue that these questions impinge upon their right to freedom of thought.  For the reasons discussed below, we reject the notion that the disclosures required of parolees subject to PSL or CSL are an improper invasion of privacy.

In assessing this claim, we must balance "the governmental interest in disclosure against the private interest in confidentiality."  Doe v. Poritz, 142 N.J. 1, 78 (1995).  We are guided by a number of cases addressing the scope of appropriate governmental intrusion into the lives of parolees.

The United States Supreme Court has recognized parole as an "established variation on imprisonment" aimed at "help[ing] individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed."  Morrissey v. Brewer, 408 U.S.

471, 477, 92 S. Ct. 2593, 2598, 33 L. Ed. 2d 484, 492 (1972). Thus, it is constitutionally permissible to subject parolees to "conditions [that] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." Id. at 478, 92 S. Ct. at 2598, 33 L. Ed. 2d at 492. For example, it is common that parolees be required to "seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness." Ibid.

With regard to sex offenders, we observe that the terms of PSL and CSL are particularly restrictive. The relevant regulations enumerate twenty-three separate restrictions imposed upon parolees. N.J.A.C. 10A:71-6.11(b)(1) to -(23). Included among those restrictions are a number of typical requirements imposed upon parolees, such as receiving permission from a parole officer to move, travel outside the state, or change jobs. See N.J.A.C. 10A:71-6.11(b)(8), (9), (16). But the PSL regulations also require parolees to comply with any imposed curfew, refrain from contacting or participating in groups or clubs that promote or encourage sexually-deviant behavior, and abstain from accessing any social networking service or chat room. N.J.A.C. 10A:71-6.11(b)(19), (20), (23).

27

We have acknowledged that the State has a significant interest in ensuring adherence to the restrictive conditions imposed pursuant to PSL and CSL "to protect the public from recidivism by defendants convicted of serious sexual offenses." Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 237-38 (2008) (quoting Sanchez v. N.J. State Parole Bd., 368 N.J. Super. 181, 184 (App. Div.), certif. granted, 182 N.J. 140 (2004), appeal dismissed, 187 N.J. 487 (2006)); see also JB I, supra, 433 N.J. Super. at 336. Accordingly, an individual subject to PSL or CSL does not possess the "full panoply of rights." Jamgochian, supra, 196 N.J. at 242. Nevertheless, we have held that "even those who possess a conditional or limited freedom have a right to protection from arbitrary government action." Id. at 241-42.

In weighing the competing interests here, we find that the State's interest in ensuring that parolees adhere to the conditions of their release pursuant to PSL and CSL outweighs the parolees' privacy interest in the information obtained during a polygraph examination. We acknowledge that much of the information disclosed by an offender during the polygraph examination may be of a private nature. Only Parole Board officers, however, are privy to that information. See Doe, supra, 142 N.J. at 82 (recognizing more substantial privacy interests implicated by public disclosure of sex offender's whereabouts). Furthermore, because the information gleaned from

28

polygraph examinations is used to monitor compliance with the terms of parole and for therapeutic purposes, we view this disclosure as justified by the efficacy of polygraphy as a tool in the treatment of sex offenders.[4]  On this point, we find the extensive factual findings issued by the trial court to be persuasive.

Based on the testimony of several Parole Board officers and expert witnesses, the trial court concluded that there is a "reasonable basis" to utilize polygraphy in the supervision of sex offenders serving PSL or CSL sentences.  JB II, supra, 444 N.J. Super. at 142.  The trial court found expert testimony concerning the Parole Board's use of instant offense polygraph examinations to be particularly compelling.  The testimony indicated that such examinations are effective at helping "sex offenders overcome denial of responsibility for their sex crimes."  Id. at 145.  In fact, experts suggested that "even the threat of having to take a polygraph can stimulate

---

[4] We base our holding on the utility of routine maintenance examinations and instant offense examinations in the treatment of sex offenders.  See N.J.A.C. 10A:72-3.3 (defining three types of polygraph examinations that may be administered by the Parole Board).  Parole Board officers testified before the trial court that sexual history examinations are never given and that there are no plans to administer such examinations in the future.  JB II, supra, 444 N.J. Super. at 134.  Without evidence in the record to support the use of sexual history examinations, we cannot opine about the privacy implications of those types of examinations.

29

admissions . . . that help sex offenders attain therapeutic goals." Ibid. (emphasis omitted). Overcoming denial is critical to sex offender therapy "because it shows the offender's ability to accept responsibility for his actions and enables the offender to move on to learning strategies to avoid similar conduct in the future." Ibid. Consequently, the trial court found that the "administration of instant offense exams can be a useful tool for therapists working with sex offenders." Ibid. (emphasis omitted).

Recognizing that the record contained "greater support for the accuracy of instant offense exams than maintenance [exams]," the trial court highlighted the fact that the Parole Board "modified its policies in 2012 and effectively did away with broad screening exams akin to fishing expeditions." Id. at 146 (emphasis omitted). The trial court also noted that the results of polygraph examinations are never used as the exclusive basis upon which to justify a modification of parole and are instead considered part of the "totality of the circumstances." Id. at 134. Thus, the trial court concluded that maintenance exams are "sufficiently reliable" and "likely to produce information that would be useful to parole supervision and treatment teams in making decisions regarding sex offenders in the community serving PSL and CSL sentences." Id. at 146 (emphasis omitted).

We conclude that polygraph examinations further the State's interest in ensuring that parolees adhere to the conditions of their PSL or CSL sentence and protect the community from recidivism.  We find that this interest outweighs the parolees' limited right to privacy.

V.

Finally, we address the parolees' challenge to the Parole Board regulations as arbitrary and capricious.  In general, we will uphold an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record."  In re Herrmann, 192 N.J. 19, 27-28 (2007).  Having already reviewed the extensive factual findings of the trial court, we find sufficient evidence in the record to support the Parole Board's use of polygraph examinations with the qualifications set forth above.  Therefore, we conclude that the parolees have not shown that we should set aside the Parole Board's regulatory scheme.

VI.

For the reasons set forth above, we affirm as modified the judgment of the Appellate Division and instruct the Parole Board to issue revised regulations consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.

31