**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3139-22

IN THE MATTER OF
ROBERT CLARK, MONROE,
POLICE DEPARTMENT.

_____

Submitted December 2, 2024 – Decided April 17, 2025

Before Judges Sabatino and Berdote Byrne.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2020-1098 and 2020-1099.

The Vigilante Law Firm, PC, attorneys for appellant (Jacqueline M. Vigilante and Christopher J. Ross, on the brief).

Brown & Connery, LLP, attorneys for respondent Monroe Township Police Department (Michael J. DiPiero and Andrew S. Brown, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Adam W. Marshall, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Robert Clark, a former police officer with the Monroe Township Police Department ("MPD"), was charged, suspended, and removed from his position after the MPD conducted five internal affairs investigations arising out of multiple allegations of Clark's misconduct from 2015 to 2017. He appeals from a final administrative determination of the Civil Service Commission ("the Commission") adopting the Administrative Law Judge's ("ALJ") initial decision and upholding the majority of his charges, his suspension, and his removal from the MPD.

On appeal, Clark raises three issues: (1) the Commission's decision to adopt the ALJ's credibility determinations was arbitrary, capricious, and unreasonable; (2) the Commission's adoption of the ALJ's findings of fact and conclusions of law was unsupported by the record; and (3) the Commission's approval of his termination violated principles of progressive discipline.

We affirm. The Commission's decision, finding the MPD investigator's testimony credible and the ALJ's findings of fact and credibility determinations supported by the record and corroborated by other witnesses' testimonies, is not arbitrary, capricious, or unreasonable. We also conclude Clark's termination was amply supported by the record before us and did not violate principles of progressive discipline.

A-3139-22

We glean the following facts from the hearing before the ALJ and the record before us. In 2005, Clark started working for the MPD as a police officer. His employment with the MPD continued until 2017, when the MPD conducted five separate, but simultaneous, internal affairs investigations relating to complaints and allegations about Clark's conduct between 2015 and 2017.

The first investigation ("Investigation I") began in January 2017, when an MPD officer filed an internal affairs complaint against Clark regarding Clark's solicitation and alleged drug use. That officer testified he heard Clark and another officer, had driven to Lindenwood, and purchased prescription drugs. He also reported he heard from other officers that Clark declared S.S., his fiancée, was "off limits" for her outstanding warrants because he was in a relationship with her. The MPD assigned a detective ("the Investigator") to investigate the complaint against Clark.

The MPD officer provided a recorded statement, which was played at the ALJ hearing, where he explained he heard a rumor regarding Clark's purchase of oxycontin. A second officer's recorded statement described escorting a man to the hospital who stated Clark should be drug tested for "Oxy 30s." The officer explained he heard Clark had gone to "another town to try to buy pills."

Additionally, that officer stated Clark told him that S.S. was "off limits" because of Clark's relationship with her.

Clark testified he was in a vehicle with S.S. and Marzi but denied knowing the purpose of their drive to Lindenwood was to purchase drugs. He stated he "asked to be let out of the car," "did not see any drugs," and had no knowledge of any drugs purchased. In an interview with the Investigator, he claimed they dropped him off, "did the thing they needed to do," and picked him up afterward.

The Investigator also interviewed S.S.'s sister regarding Clark's alleged illicit drug use. She showed the investigator, Facebook messages from June 2015 between her and Clark where he asked if she could supply him with Percocet. Screenshots of these Facebook messages concerning Percocet and marijuana were admitted in evidence at the ALJ hearing.

Clark testified S.S.'s sister was an informant for the MPD, and he sent the messages about Percocet in a "joking context" to make her more comfortable in speaking with him. However, the Investigator testified he was unaware of any arrests related to any information the informant had provided to Clark.

The same informant also gave a statement concerning Clark's sale of his personal handgun. Clark admitted he sold his handgun to a corrections officer he had met online and stated he had a bill of sale. He could not remember the

name of the corrections officer, when, or where he met the officer to exchange the handgun, and did not provide the MPD with the bill of sale. He explained to the Investigator he saw the buyer's firearms ID and purchase ID, and the man signed a document agreeing to mail the paperwork to Clark, but he did not produce any documentation to the MPD.

The same Investigator conducted a second investigation ("Investigation II") of an internal affairs complaint against Clark regarding his interference with a motor-vehicle stop involving S.S. in March 2017. S.S. was pulled over by an MPD officer for driving with a suspended license. The responding officer reported he learned S.S. had two outstanding warrants for her arrest after she was pulled over. At the time, Clark responded to the scene without activating his police lights. He requested a "professional courtesy" from the responding officer to not take S.S. into custody. The responding officer called his Sergeant, to the scene "because he was uneasy with . . . Clark being there." Clark was reportedly agitated. The responding officer stated Clark acted inappropriately and he advised Clark he should not have been at the scene and to asked him to leave. The Investigator was able to obtain dashcam and body-camera footage from the responding officer and an another MPD officer present, but no footage was available from Clark's vehicle.

During his interview with the Investigator, Clark stated he had responded to the scene as a backup officer. Clark admitted he had been assigned to patrol a different area, and the traffic stop occurred outside of this designated area. Nevertheless, he justified his actions by stating the responding officer was alone on duty and it was common for officers to float between locations. He also testified he did not know the stop involved S.S. until he arrived and saw his truck, which S.S. had been driving. He informed the Investigator S.S. had called him, but he did not answer his phone.

The Investigator requested an audit of Clark's "look-ups" in the Criminal Justice Information Services and Pro-Phoenix databases to review whether Clark had utilized law enforcement databases for personal reasons. The audit revealed Clark had looked up S.S. in the databases several times without authorization, violating MPD policy. Clark admitted the "look-ups" were for personal, non-work-related reasons.

In May 2017, at the conclusion of Investigation II, the MPD served Clark with a preliminary notice of disciplinary action ("PNDA"), seeking a ninety-day suspension for interfering in the motor vehicle stop of his fiancée. The PNDA charged Clark with violating N.J.A.C. 4A:2-2.3(a)(6), "conduct unbecoming a public employee," and three rules and regulations.

6

The Investigator testified that, based on his involvement in Investigations I and II, he was assigned a third internal affairs complaint against Clark ("Investigation III"). This investigation was a culmination of the other investigations, primarily investigation I. The Investigator applied for a reasonable-suspicion drug test for Clark with the MPD Chief of Police. Prior to the drug test, Clark listed drugs he was prescribed and included Percocet on the list. In August 2017, Clark was tested for drugs and his results came back "positive for oxymorphone, which is consistent with Percocet use." The Investigator instructed Clark to have his prescribing doctor contact the MPD and provide confirmation the drug had been medically prescribed to him. Clark claimed in his interview with the Investigator that two days before his drug test, he visited an oral surgeon for a tooth extraction and the following day, he called the oral surgeon's office regarding nausea from the prescribed Vicodin. Clark explained a woman in the oral surgeon's office told him he could take Percocet instead of the Vicodin, which had been previously prescribed to him by a different doctor in 2016.

The oral surgeon's office later advised the Investigator no one spoke with Clark about switching his medication, they would not have given him permission to take the previously prescribed drug, and they had no record of the request in

7

his chart. Employees from Clark's current oral surgeon's office and his previous doctor's office testified they would never approve a patient's request to change prescribed medication without the doctor's permission, and did not recall a patient calling to inquire about taking Percocet or Vicodin. When he was interviewed by the Investigator a second time regarding his positive drug test results, Clark maintained he was told he could take the Percocet prescribed to him a year earlier. The Investigator subsequently brought a new allegation against Clark for conduct unbecoming a police officer related to having provided a false statement in the internal affairs interview. As a result of Investigation III, Clark was suspended and placed on paid administrative leave pending the outcome of the investigation.

On July 28, 2017, Clark was involved in a domestic dispute in Bellmawr, while he was on administrative leave. An MPD officer working in internal affairs investigated this incident ("Investigation IV"). Clark was not permitted to have his badge or identify himself as an officer and was required to turnover his identification and MPD-issued weapon.

A detective with Brooklawn Police Department ("BPD") testified he witnessed a vehicle driving against traffic. He could see a woman outside the vehicle arguing with the driver, who was later identified as Clark. The officer's

recorded statement with MPD investigators was played at the hearing. While speaking to the woman, later identified as Clark's mother, the officer saw Clark's hand outside the window displaying "some type of badge." He contacted Bellmawr Police Department for assistance and thought Clark might have been impersonating a police officer. After asking for identification, Clark informed him he did not have any. Clark eventually told the officer he was suspended from the MPD.

A BPD officer was dispatched to the scene and observed Clark's car facing opposing traffic and causing a traffic hazard. In a recorded statement, that officer explained Clark disclosed he was an officer with MPD and was on suspension. Clark notified them his weapon was in the center console of the vehicle. The officer retrieved an unloaded weapon.

Clark testified his car was parked in a residential area facing the opposite direction of traffic, but not in the roadway. When asked about displaying the badge, Clark stated he was showing the officer the badge in response to them inquiring about it, and he did not recall holding it out the window. Clark testified the badge was in a "display case that you put up on a shelf."

Clark testified his car was parked in a residential area facing the opposite direction of traffic, but not in the roadway. When asked about displaying the

A-3139-22

badge, Clark stated he was showing the officer the badge only in response to them inquiring about it, and he did not recall holding it out the window. He also claimed his firearm was locked in his car's center console.

The final investigation ("Investigation V") involved Clark's former landlord and the alleged theft of his property. The landlord testified the property he rented to Clark came with a refrigerator, washer, and other home appliances, and the rental agreement required all appliances were to remain on the property. Because Clark dd not make his monthly rental payments, the parties agreed he would move out by mid-July. During the walkthrough of the property, the landlord discovered the refrigerator and washer were missing and reported the appliances as stolen. An advertisement listing a refrigerator for sale, with pictures of the landlord's refrigerator and kitchen, were posted on Craigslist. The advertisement included Clark's name and phone number.

Clark testified the refrigerator had broken and he had asked S.S.'s uncle to fix it. He testified the washer had broken previously, and after speaking with the landlord regarding the issue, the landlord told Clark he could have the washer and do whatever he wanted to do with it. Clark explained S.S.'s uncle picked up these appliances. Clark denied knowing who sold the appliances and testified he did not use Craigslist.

10

In November 2017, the MPD served Clark with a second PNDA based on the charges and allegations arising out of Investigations II, III, IV, and V. As a result, Clark was suspended without pay. On September 27, 2019, the MPD served Clark with two final notices of disciplinary action ("FNDA") charging him with violations of rules and regulations and N.J.A.C. 4A:2-2.3(a)(6). Respectively, the FNDAs imposed a ninety-day suspension and removal effective November 1, 2017, the date of his suspension.

Clark waived his right to a departmental hearing on all charges, and appealed his charges, suspension, and termination directly to the Office of Administrative Law ("OAL") on October 10, 2019. Clark's OAL hearing was held on April 19, May 2, and June 13, 2022. The ALJ issued a detailed initial decision denying Clark's appeal, sustaining all his disciplinary charges except for two, and upholding his suspension and termination.

After reviewing the investigations, witness testimonies, and evidence, the ALJ concluded that the MPD proved by a preponderance of the evidence Clark's actions constituted conduct unbecoming a public employee in violation of N.J.A.C. 4A:2-2.3(a)(6), and he violated several rules and regulations, requiring his termination from the MPD. The ALJ reversed two of Clark's charges: (1) violation of Chapter 3:6.1, Alcoholic Beverages and Drugs, because the MPD

had failed to prove Clark was either under the influence while on duty or disclosed the use of prescription medication that affected his ability to perform the essential functions of his job without posing a direct threat to himself or others; and (2) violation of Chapter 3:11-3, Conduct Towards the Public, regarding his interference in S.S.'s traffic stop because the MPD's "interpretation of this provision appear[ed] overly broad and inapplicable in this instance."

Nevertheless, the ALJ sustained the MPD's suspension of Clark for several reasons. First, the MPD "demonstrated [Clark's] actions in response to the motor-vehicle stop of his fiancée . . . constitute[d] a violation of Monroe's General Order 1:2, Rules and Regulations, Chapter 1:5-2, Code of Ethics, Chapter 3:1-8, General Conduct, Compromising Criminal Cases/Investigations, and Chapter 3:13-5, Truthfulness." Second, Clark admitted he conducted criminal history "look-ups" of S.S. for personal use, which was a misuse of the Criminal Justice Information System. Third, Clark admitted he did not activate his police lights when he arrived on scene after S.S. was pulled over, "there was no [Mobile Video Recording ("MVR")] footage available from [Clark's] car, and . . . Monroe's rules and regulations require activation of the MVR system during all motor-vehicle stops."

12

In making these determinations the ALJ relied primarily on the credibility of the witnesses. She found all testimony credible except for Clark's testimony, which she concluded was directly contradicted by the other more credible and reasonable evidence in the record. Further, the ALJ found Clark's testimony regarding the allegations against him was not reasonable, rational, or reliable.

Clark filed exceptions. The Commission considered the ALJ's initial decision and on May 3, 2023, issued a final administrative decision adopting the ALJ's findings of fact, credibility determinations, conclusions, and sanctions. Upon its de novo review, the Commission found Clark's claims in his appeal were not persuasive in demonstrating that the ALJ's credibility determinations, or her findings and conclusions based on those determinations, were arbitrary, capricious, or unreasonable. It noted the ALJ's decision was substantially based on her credibility determinations and gave deference to such determinations.

The Commission also reviewed the penalty assessment against principles of progressive discipline, Clark's prior record, and the nature of his offense. It agreed with the ALJ's recommendation and similarly determined that because of the egregious nature of Clark's misconduct, removal was appropriate regardless of the lack of any prior disciplinary history. It explained, although Clark had been an employee of the MPD for a long period of time, and only had "minimal"

13

previous discipline, "his actions in this matter fall well short of what is expected of a law enforcement employee and certainly are likely to undermine the public trust." This appeal followed. The MPD opposes the appeal and endorses the sanction of termination imposed by the Commission.

## II.

"Our review of an administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011); see also Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). We presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). For those reasons, we will not overturn an agency decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Stein v. Dep't of L. & Pub. Safety, 458 N.J. Super. 91, 99 (App. Div. 2019) (quoting J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017)); see also In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008) ("[A]n appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by

14

substantial evidence."). The party challenging the agency's action has the burden of proving the action was arbitrary, capricious, or unreasonable. Lavezzi, 219 N.J. at 171.

Deference to agency decisions "applies to the review of disciplinary sanctions as well." In re Herrmann, 192 N.J. 19, 28 (2007). "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test . . . is "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness."'" Id. at 28-29 (omission in original) (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29.

On appeal, Clark contends the Commission erred in adopting the ALJ's finding that the Investigator was credible because the determination was unsupported by evidence in the record. Our review focuses upon whether the Commission's decision to adopt the ALJ's credibility determinations and factual findings is supported by substantial credible evidence. Virtua-West, 194 N.J. at 422. Our review of the record confirms each of the ALJ's findings and credibility determinations are supported by credible evidence. Clark's

arguments are belied by the copious factual record of his wrongdoings. See In re Stallworth, 208 N.J. 182, 194 (2011) (requiring our examination of "whether the record contains substantial evidence to support the findings on which the agency based its action").

The ALJ observed each witness who testified and found them all more credible than Clark. She determined Clark was not credible because his version of events or explanations in his testimony was not reasonable, rational or reliable. The ALJ noted Clark's testimony "appear[ed] to be an attempt to make excuses for his improper conduct and/or to deflect attention away from himself and place blame on others for the disciplinary charges filed against him." We defer to that well supported finding.

Clark admitted he sent the Facebook messages requesting Percocet to the alleged informant, appeared at S.S.'s traffic stop although outside his assigned jurisdiction, sold his handgun and could not produce the required paperwork, and was aware of the potential criminal activity during the trip to Lindenwold to purchase drugs. He did not provide any documentation to support his version of events or disprove the MPD's charges. Further, the ALJ did not rely solely on the Investigator's testimony but premised her decision also on the testimony and credibility of every witness and documentary evidence.

16

We conclude there is ample credible evidence to support the Commission's adoption of the ALJ's findings of fact: the Craigslist post advertising the landlord's stolen appliances listed Clark's name and phone number; Clark could not provide the name of the person he sold his handgun to or the necessary paperwork; the Facebook messages from him to the informant revealed he asked her for Percocet; and his medical records did not reflect that he was prescribed Percocet. Based upon our review of the evidence in the record, the Commission properly determined the ALJ's credibility determinations and factual findings were adequately supported by substantial credible evidence.

Clark also argues his termination from the MPD violated principles of progressive discipline because he had no prior discipline or infractions with the MPD. He maintains the overall penalty was "too severe, arbitrary and is unwarranted under the circumstances," and even if this court concludes one or more of his charges should be sustained, his termination would still be "excessive, unreasonable and capricious."

New Jersey case law recognizes and accepts the concept of progressive discipline, which promotes uniformity and proportionality in the discipline of public employees. See Herrmann, 192 N.J. at 33; In re Restrepo Dep't of Corr.,

A-3139-22

449 N.J. Super. 409, 424 (App. Div. 2017). Progressive discipline may be applied in two ways: (1) to "support the imposition of a more severe penalty for a public employee who engages in habitual misconduct," or (2) "to mitigate the penalty for a current offense" when an employee has no record or a limited record of misconduct. Restrepo, 449 N.J. Super. at 424 (quoting Herrmann, 192 N.J. at 30, 32).

However, our Supreme Court has also acknowledged the theory of progressive discipline is not "a fixed and immutable rule to be followed without question" and has "recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." In re Carter, 191 N.J. 474, 484 (2007); see also Restrepo, 449 N.J. Super. at 425. "Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." Stallworth, 208 N.J. at 196-97 (quoting Herrmann, 192 N.J. at 33). Further, "[i]n matters involving discipline of police and corrections officers, public safety concerns may also bear upon the propriety of the dismissal sanction." Carter, 191 N.J. at 485.

The Commission upheld the ALJ's finding that Clark's actions "demonstrate[d] a complete lack of judgment, personal integrity, and dependability" contrary to the high standards required of a police officer. We agree. The Commission's decision was supported by credible evidence in the record, which demonstrated Clark engaged in conduct unbecoming of a public employee pursuant to N.J.A.C. 4A:2-2.3(a)(6) when he involved himself in his fiancée's traffic stop, requested a courtesy from the responding officer, solicited Percocet, sold his handgun without the proper paperwork, lied as to the source of the Percocet in his system during his initial internal affairs interview after failing the drug test, drove into oncoming traffic, was involved in a domestic altercation, flashed his retired father's police badge and stated he was an "off-duty" officer while on suspension, improperly transported his handgun in violation of MPD policy, and was involved in the theft of his landlord's property. This litany of sustained egregious conduct more than proved his complete disregard for his position and required his immediate termination in the interest of public safety. Clark's termination from the MPD is not "shocking to [our] sense of fairness," see Herrmann, 192 N.J. at 29, and we defer to the Commission's determination regarding Clark's disciplinary sanctions because they are not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3139-22